```
 1                IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF CALIFORNIA
 2


 3     Mitch Davenport,
               Plaintiff,
 4
       vs.                              Sacramento, California
 5                                      No. CV. S-14-931
       The Wendy's Company, et          Wednesday, 10/21/15
 6     al.,                             10:26 a.m.
               Defendants.
 7     _____/


 8                       TRANSCRIPT OF HEARING


 9        BEFORE THE HONORABLE JOHN A. MENDEZ, DISTRICT JUDGE
                            ---oOo---
10


11    APPEARANCES:


12      For the Plaintiff:          Jones Law Firm
                                    9585 Prototype Ct.
13                                  Suite B
                                    Reno, NV 89521
14                                  By:  Charles A. Jones
                                    Attorney at Law
15


16      For the Defendants:         Greenberg Traurig
                                    1840 Century Park East
17                                  Suite 1900
                                    Los Angeles, CA 90067
18                                  By:  Mark David Kemple
                                    Attorney at Law
19


20


21      Official Court Reporter:    Kimberly M. Bennett,
                                    CSR, RPR, RMR, CRR
22                                  501 I Street
                                    Sacramento, California  95814
23                                  (916) 442-8420


24


25      Proceedings recorded by mechanical stenography, transcript
        produced by computer-aided transcription
```

1          (Court called to order, 10:26 a.m.)

2               THE CLERK:  Calling Civil 14-931; Davenport versus

3     the Wendy's Company, et al.

4               MR. KEMPLE:  Do you want us at the podiums or back

5     here?

6               THE COURT:  It's up to you.  As long as I can hear

7     you.

8               THE CLERK:  Counsel, state their appearances.

9               MR. JONES:  Good morning, Your Honor.  Charles Jones

10    for the plaintiff, Mitch Davenport.

11              MR. KEMPLE:  Good morning, Your Honor.  Mark Kemple

12    appearing on behalf of the defendant, Wendy's International.

13              THE COURT:  This is on with respect to the

14    plaintiff's motion for class certification, and plaintiff also

15    brought a motion to strike 27 declarations that were obtained

16    by counsel for the defendant.

17         The motion for class certification has been opposed, as

18    well as the motion to strike.

19         There also were objections -- evidentiary objections filed

20    by the defendants to numerous declarations.

21         To your credit, Mr. Jones, you didn't take the bait and

22    file an 85-page response to those objections.  The Court

23    appreciates your decision not to add another 85 pages and kill

24    more trees with respect to these motions.

25         As to the objections, I'll take those up first.

1          I don't know why they were filed, Mr. Kemple.  And it seems

2     to -- it was really interesting to me that in opposing the

3     motion to strike, you make the point, which everyone

4     understands in these types of motions to certify a class, that

5     first they're made to a judge so the judge can self-police any

6     declarations, evidence that is not relevant, improper, it also

7     can be generally considered by a court.  In fact, you

8     specifically, I think I highlighted it in your opposition, you

9     make the statement -- I can't find it right now, but in effect

10    agreeing that that is the evidentiary standard, that courts can

11    consider evidence that might otherwise not be admissible.

12         So other than do unnecessary work, increase the bill to

13    your client, there was no point and no reason to file the

14    objections.  All the objections are overruled, given that the

15    law allows the Court to consider non-admissible evidence if I

16    want, and it really goes to, as you argue in the motion to

17    strike, admissibility, not weight -- I mean goes to weight, not

18    admissibility, and therefore I'm not going to spend any more

19    time on the objections.

20         As to the motion to strike, Mr. Jones, I understand why you

21    may have felt the need to file that.  I just didn't find it

22    convincing at all that it fell within the same type of fact

23    pattern as the cases you rely upon in which there was much more

24    egregious conduct.

25         The basic complaint, when you look at the eight

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1   declarations that you submitted, is that certain things weren't

2   told, not that there were affirmative misrepresentations.

3   There are at least some declarations that claim that there were

4   affirmative misrepresentations made.  But on the other hand, as

5   the defendants point out, all that does is create an issue of

6   fact that I need to try to resolve, which I can't really

7   resolve without having a full-blown hearing and having all

8   these people come in and testify, and cross-examine, and I'm

9   not going to do that in this case.

10      It also is, as defense pointed out, somewhat questionable.

11  I remain somewhat skeptical that suddenly these eight people

12  can remember in great detail what was not said to them 17

13  months after they apparently met with these lawyers.

14      Third, your declarations suffer from the same problem that

15  the 27 declarations suffer from, and that is, they're written

16  by lawyers.  I'm not sure why either side thinks that

17  submitting declarations written by lawyers and then signed by

18  someone who has apparently been convinced to sign the

19  declaration carries much weight at all with the Court.  Your

20  declarations are not nearly as bad as the defendants'

21  declarations, which are basically just a form that they have

22  people sign, it's not a declaration in any sense.  And what

23  concerns me most in this case is the lack of deposition-type

24  testimony.  There are few, if any, declarations that I read in

25  which it seemed like the person making the declaration actually

1   and genuinely gave the declaration.

2       And I started out saying I understand why you brought this

3   motion, because, Mr. Kemple, the way you went about obtaining

4   these statements opened yourself up to a motion like this.

5   There were so many other things you could have done which you

6   didn't do, and you chose not to do, with respect to the 27

7   interviews.  And as I think Mr. Jones pointed out, you could

8   have used, initially, a waiver form, made it clearer.  You

9   chose not to do that.  You could have recorded these

10  interviews.  You could have had your lawyers go back and

11  actually draft a declaration and then send it back to the

12  declarant with a cover letter which would have proved that you

13  actually gave them an opportunity to read the entire letter.

14      I'm as skeptical about your lawyers' declarations as I am

15  about the eight declarations submitted by the plaintiff.  It is

16  incredible how great everyone's memory is of an event that

17  occurred 17 months ago, or in some cases 2 years ago, how one

18  of your lawyers -- and, unfortunately, she's not here, and

19  she's a young lawyer, she's an associate, I would love to have

20  her come in court and go over that declaration with her.  If

21  she was put on the stand and Mr. Jones had an opportunity to

22  cross-examine her, I don't think she'd want to be a lawyer any

23  longer.  How does she remember that there was someone sitting

24  in a car?

25      None of the declarations from your lawyers contain quotes.

1    It's really interesting, they sort of -- they contain quotes

2    from the declarants, but they don't contain any quotes from

3    themselves, so I don't know specifically what they said.  I

4    don't know specifically if they are working off a script.

5       I know that there was a meeting, and, obviously, you're

6    such an experienced lawyer, and it's such an experienced law

7    firm, that you met and talked to these associates before you

8    sent them out.  But the level of control and the lack of

9    concern for just common sense ethics is of great concern to me.

10      I don't like what I see in this case in terms of what these

11   lawyers are being taught, and how, especially on these

12   interviews, they've been taught to -- you can see it from the

13   declarations:  Meet with the person, stick to the form.  In

14   some cases, I guess in every case, they printed out the form

15   right there.  That's a lengthy declaration.  So even -- I don't

16   necessarily believe your clients saying, I only saw the last

17   page.  That doesn't seem believable to me.  On the other hand,

18   it's a multipage document.  I don't think anybody who is in a

19   hurry to get out of work and has just met with a lawyer is

20   going to sit there and read every paragraph by every paragraph.

21   Which is why, again, I don't -- I don't necessarily fault you

22   for bringing this motion.

23      But as a matter of law, while they pushed to the limit what

24   is or isn't allowable under Rule 3600, looking at this overall,

25   it just doesn't rise to the level of the other cases.  There

1    are, as the defendants relied on, three cases in the Eastern

2    District of California decided by a magistrate judge that tend

3    to support the defendants' conduct.  So while it may have been

4    within the law, while it may not have violated the Rules of

5    Professional Conduct, it sure came close.

6        And you preserved this issue.  The court of appeals might

7    disagree with me, they really might under these circumstances.

8    They might disagree if you had an opportunity to cross-examine

9    those three lawyers, but you don't.  But I -- it's of grave

10   concern.  And I think ultimately it does go -- as you discuss

11   in your reply, Mr. Jones, it really goes more towards -- at

12   least in part, towards how much weight am I going to give to 27

13   declarations that are identical, and that under any rational

14   view, common sense view, don't reflect the interview that took

15   place.  These were written by a lawyer beforehand, and then a

16   lawyer, using their skills, convincing someone to sign it.

17   That's the way I look at those 27 declarations.  And so we'll

18   talk about that with respect to the motion for class

19   certification.

20       For all those reasons, I am denying the motion to strike

21   the 27 declarations.

22       Just as an aside, I also -- Mr. Kemple, I don't necessarily

23   agree with you that just because three of the individuals,

24   quote, no longer work for Wendy's, that the Rules of

25   Professional Conduct didn't apply to those three.  I think, as

1    lawyers, they were still working for a Wendy's franchise, they

2    should be treated the same way.

3        There is this overall obligation I think you have, as a

4    lead partner in this case, to make sure that your lawyers

5    understand better that they don't need to use omissions, they

6    don't need to hide things.  And in fact, as lawyers, they need

7    to be more upfront so they can avoid having to write

8    declarations like this in which they are required to suddenly

9    remember details that I don't think they possibly could

10   remember and, second, defend their conduct.  When a lawyer has

11   to defend his or her conduct in a declaration, that's not a

12   good sign.  And that usually comes from the top in terms of

13   what they're told to do.  So I issue that -- that caution, that

14   ethics has to be foremost in the practice of law, and that's

15   what I would tell these associates.

16       Okay.  Let's take up the motion for class certification.

17       I need you to explain to me -- you come up with this plan

18   because, apparently, you convinced the state court judge that

19   bifurcation is wonderful, and this is how we should proceed,

20   and you attempt to utilize that and, obviously, you were

21   successful in convincing that judge that that's the way it

22   would proceed.

23       And I tend to agree with you that in a perfect world, if I

24   didn't have 1100 cases, and we weren't six judges short, I'd

25   love to be able to say to you, Mr. Jones, that's exactly how

 1   I'd like to proceed if I certify this class.  But for purposes

 2   of this hearing, I want you to assume that there is no chance

 3   whatsoever that this case, if it's certified, could proceed in

 4   that manner.  Bifurcation is out.  Phases are out.  We just

 5   don't have the time -- and it's mainly time -- to give this

 6   case that type of attention.  No chance at all.  I mean, we're

 7   lucky to get civil cases to trial at this point given our

 8   caseload.  And that's something that bothers me, and it bothers

 9   every judge on this court.  There have been numerous articles

10   recently that have led us to become more vocal, which judges

11   normally aren't, about how we're really affecting justice in

12   the federal courts.

13       So I look at your proposal and I just say, okay, that's not

14   going to happen.

15       So how would this work if I certified your class with no

16   bifurcation and no ten randomly chosen?  That's question number

17   one.

18       My second question is:  Who randomly chooses these ten

19   people?  Do I let the defendants randomly choose these ten

20   people?  Because I know which ten people they would choose.

21   They would be your client and 9 others from their 27.

22       And why ten?  I mean, Mr. Kemple makes an excellent point,

23   why not just one?  Why not just take your client's case to

24   trial and let's see what happens rather than certify a class?

25       So that's my first overall question, is to how you envision

1    this might work if I certified this class without bifurcation,

2    and how would you go about choosing these ten random people.

3    Because there are only 108.  It's a little different from other

4    motions in that I'm not dealing with 2500 potential class

5    members.  So we're dealing with 108 people.

6        Go ahead.

7            MR. JONES:  Thank you, Your Honor.

8        You are correct, it is a relatively small class, which I

9    think does distinguish this case from some of the other cases

10   where courts have had great difficulty, like the Dukes versus

11   Wal-Mart case where you had a million plaintiffs.

12           THE COURT:  Still meets the numerosity requirement.

13           MR. JONES:  Thank you.  Yes, Your Honor, it does.

14   And I thank Mr. Kemple for not contesting that prong of

15   Rule 23(a).

16       However, with respect to your questions, let me answer the

17   second question first on the random selection.  And I've done

18   this a number of times in a number of different ways.  The

19   random selection is simply that it is truly random.  I thought

20   that the best way it worked, and it's very cost effective, is

21   you simply put the names into an Excel spreadsheet program, and

22   it has a randomizer; you press a button and it randomizes the

23   names and it ranks them, you know, 1 through 108, and that's

24   how you have your random selection.  Other ways I've seen it

25   done, when you have experts involved, is one expert randomizes

1   the names, the other expert randomizes the numbers, and then

2   you put the two together and then you truly have a random list

3   of 108 people.

4       You asked me why I selected ten --

5           THE COURT:  Right.

6           MR. JONES:  -- I selected it, number one, as a

7   starting point.  Number two, it's approximately 10 percent of

8   the class.  And by doing the random selection, one of the

9   benefits is you hear from these ten people, and if the fact

10  finder still is unclear as to whether or not liability can be

11  established as to the whole, you simply keep going down the

12  list because you've randomized the entire list.  So you start

13  with ten and, as I said, I apologize for repeating myself, you

14  just keep going down the list.

15      One thing that I have to state, Your Honor --

16          THE COURT:  I don't follow that.  So I have a trial

17  on liability involving ten individuals, then what happens?

18          MR. JONES:  Well, what -- we see this case --

19          THE COURT:  Let's say I find their classification of

20  those ten employees as exempt violates California law, let's

21  say that's my finding, then what happens next?

22          MR. JONES:  What would happen next is that would be

23  the finding that would apply to the remainder of the group.

24          THE COURT:  Why?  How can I jump from that to, okay,

25  the other 98 it's the same thing?

1          MR. JONES:  Several reasons, Your Honor.

2       Really, we're talking about -- I need to bring up that we

3    have two exemptions at play, and we have one issue that is

4    common to both exemptions, and that is the independent judgment

5    and discretion issue.

6       I think this case is similar to the Boyd versus Bank of

7    America and Nelson versus Avon cases in that --

8          THE COURT:  I think it's almost identical to the

9    Zackaria versus Wal-Mart.  It's almost that case.  But there

10   may be -- and I'm telling you upfront, both lawyers, and I know

11   that case went against the ruling you want --

12          MR. JONES:  Correct.

13          THE COURT:  There may be differences in this case,

14   and that's my focus here.

15          MR. JONES:  Okay.

16          THE COURT:  How is this -- because this is -- this is

17   a great discussion of the law.  It's a really well-written

18   opinion, a great discussion of the law, and it's really the

19   facts that led that judge to decide not to certify the class.

20   So I'm not saying that case is dispositive here, I'm just

21   saying it's great in terms of allowing me to think about this

22   case and say, Is there something different about what Wendy's

23   does that was different from what happened with the Wal-Mart

24   individuals?

25          MR. JONES:  Absolutely, Your Honor.

1        The primary difference -- and I -- I do agree with you 100

2   percent, Your Honor, these cases are all factually driven.

3   This is an incredibly factually-driven decision that the Court

4   has to make.  And I think where the Court is going with this

5   is, obviously, to the elements of predominance and superiority.

6   And so that's where I'm going to focus --

7        THE COURT:  Yeah, I should make that clear.  I don't

8   see any need to discuss, or have much discussion, on

9   numerosity, on typicality.  There are arguments against it, but

10   I think Mr. Davenport is close enough.

11        There was that little tweak that Davenport's declaration

12   was wrong, that he wasn't a manager for two years.  At one

13   point he was an assistant manager, and then he became a

14   manager.  He was only in his GM position for about a year

15   though, right?

16        MR. JONES:  Just over a year, I believe, Your Honor.

17        THE COURT:  Just be careful.  Again, another example

18   of how declarations tend to be generalized.

19        In terms of adequacy, there were arguments with respect to

20   that.  Again, I don't think that that is the key issue.  It's

21   really the commonality and the predominance issue that is going

22   to drive this decision.  And whether this, again, is more like

23   Zackaria, or whether there is something that distinguishes --

24   the proof that would have to be made in this case that

25   distinguishes it from that case.

1          MR. JONES:  Let me get to the heart of the facts of

2   this case and distinguish them for you from Zackaria then, Your

3   Honor.

4      As I understand the Zackaria opinion, again, as Your Honor

5   stated, very factually driven.  However, what the court found

6   that led it to conclude that the case was not -- should not be

7   certified was a couple things:

8      Number one, they found that there was evidence that the

9   corporate policies that the plaintiffs were relying on, the

10  class members actually had the authority to deviate from those

11  corporate policies.  There is no such evidence in this case.

12  Even if Your Honor is to credit the 27 declarations and give

13  them any weight at all, they don't discuss independent judgment

14  and discretion, they focus solely on the time spent on the 50

15  percent test issue.  I believe that in each declaration there

16  is a statement that, I customarily and regularly; that's a

17  legal conclusion, Your Honor.  We didn't bring a motion to

18  strike because --

19          THE COURT:  You didn't need to.

20          MR. JONES:  Again, I think we can all agree that

21  that's not admissible.  However, outside of that, there is no

22  discussion whatsoever.

23     So unlike Zackaria here, number one, there is no evidence

24  to suggest that class members had the discretion to deviate

25  from the corporate policies and procedures.

1          And number two, there is no evidence from the defendant to

2     suggest that the class members exercised their discretionary

3     powers differently.

4          What we have here in the Wendy's case, Your Honor, and

5     really the genius of Wendy's business model, and what has made

6     Wendy's so successful is what compels certification in this

7     case.  And --

8                    THE COURT:  Stop there, though.

9                    MR. JONES:  Okay.

10                   THE COURT:  I know you have to shade over into the

11    merits.  That's a merits argument.  And I'm -- when I look at

12    these motions to certify class, I look at them as, what's this

13    trial going to look like?  Is it subject to, you know, proof

14    of -- and evidence that can almost be stipulated to?  And I

15    look at this and I think, there is really no dispute as to

16    what's in those manuals.  You could stipulate to the documents.

17    But that's very similar to the Wal-Mart case in that Wal-Mart

18    had similar policies in terms of what the managers were

19    expected to do.  Wendy's doesn't disagree with you that those

20    policies require these GMs -- or did require these GMs to do

21    certain things during their -- during their shifts; they had to

22    be on the floor, you know, they had to -- I think it's

23    pretty -- subject to common proof that -- and no one disagrees,

24    that there was a list of tasks that the general managers were

25    expected to perform.  And so even those are somewhat subject to

1  common -- common proof, a pattern and practice that even

2  Wendy's wouldn't disagree with.

3      The question becomes, though, this sort of 50 percent

4  issue.  Did they spend -- one, what were they doing?  And in

5  your case this is a five-year period involving 108 people.  Not

6  everybody worked all five years, obviously, but how do you

7  prove liability for the entire class with -- what -- I'm trying

8  to figure out how you do that without individual managers

9  talking about their experience.  That's the problem I'm having

10 with certifying the class.

11     And I know -- and one way you do that is you say, well,

12 let's limit it to ten at first, and that's not feasible in this

13 court.  So I have to look at I've got 108 plaintiffs, how do I

14 decide that -- I know what was expected of them, no question,

15 and there is no dispute as to what was expected.  And you've

16 got district managers I don't think who disagree that this is

17 what we looked for when we came into the stores.  But how do I

18 know, day in and day out, exactly what they were doing

19 without -- how is that subject to common proof?  Because that's

20 the key issue.  What were they doing?  Not what were they

21 required to do, but what were they doing?  And I don't know how

22 you prove that without calling 108 people if you want me to

23 find liability for the entire class.

24     I think your one solution is listen to 10 or 20 people and

25 then, in effect, extrapolate that the other 88 are going to --

1   or the other 88 had the same experience.  Again, I don't -- I

2   don't feel comfortable making findings of fact on that type of

3   scenario.  That's the issue I'm starting with in terms of your

4   motion.

5              MR. JONES:  I thank you for that, Your Honor.

6       I think there are two issues at play.  Again, we mentioned

7   the two different prongs of the exemption.  We have the

8   independent judgment and discretion, which is not, Your Honor,

9   a 50 percent test.  There is no 50 percent up or down

10  requirement on that issue.

11      And then we have the -- what we're all calling the 50

12  percent test, we all know what that means, primarily engaged in

13  exempt work --

14             THE COURT REPORTER:  Excuse me.  You need to slow

15  down.

16             MR. JONES:  I apologize.

17             THE COURT:  Go ahead.

18             MR. JONES:  Thank you.

19      Let me address those two issues separately, because the

20  Court could find, as the court found in the Nelson versus Avon

21  case, that individual issues predominated on the 50 percent

22  inquiry, but nevertheless found that common issues predominated

23  with respect to the independent judgment and discretion

24  inquiry.

25      On the independent judgment and discretion inquiry, I'll

1    begin with that first, you don't need to hear the testimony

2    from every class member.  We have -- the one deposition that's

3    been taken in this case, Your Honor, was that of Wendy's

4    Rule 30(b)(6) designee.  And his testimony is quite clear, on

5    the record, that these general managers, as a rule, do not have

6    the discretion to deviate from the detailed policies and

7    procedures set forth in the manual, which, as Your Honor saw,

8    dictate everything from how to properly clean the restaurant to

9    where to place the items on the food tray, to the type of bag

10   that you can use to bag the items, and which item goes on the

11   bottom and which goes on the top.

12        So, under the Code of Federal Regulations provisions, the

13   relevant inquiry, which is the same for each and every class

14   member, is whether these class members had the freedom to make

15   an independent choice, free from immediate supervision or, as

16   the plaintiffs contend, whether they simply applied their

17   knowledge of Wendy's standardized operating procedures.

18        If the answer is the latter, then they are all

19   misclassified, every single one of them.  And don't -- don't

20   just take it from the Rule 30(b)(6) testimony, Your Honor.  One

21   of the other pieces of evidence that we submitted was Wendy's

22   10-K filing, where -- it's Exhibit 20 to the certification

23   motion -- Wendy's strives to maintain uniformity throughout all

24   restaurants by publishing detailed specifications for food

25   products, preparation and service.

1            THE COURT:  Is -- let me ask you quickly, is it a

2     either/or?  So the independent judgment and the -- we're

3     calling it the 50 percent -- do both have to be proven or it's

4     just one or the other?

5            MR. JONES:  In order to meet the test for exemption,

6     the defendant needs to prove, because it's their burden, that

7     each element of the executive exemption test is met.

8        So you could have a situation, for example, where these

9     individuals spent more than 50 percent of their time on exempt

10    work, but, nevertheless, if they do not exercise independent

11    judgment and discretion, they don't meet the test.

12           THE COURT:  Let me stop you.

13           MR. JONES:  Sure.

14           THE COURT:  Because I want to ask Mr. Kemple, in your

15    opposition, where is the at least evidence or suggestion on

16    that issue, that these general managers did exercise some type

17    of independent judgment?  And, if so, more specifically, what

18    are the examples of that?

19        Because Mr. Jones lists 10, 15 areas where they clearly

20    don't exercise independent judgment.  You don't disagree with

21    that because it's based on manuals.  But where is the -- where

22    is the evidence that these managers did anything independently?

23        I don't even think they had the ability to hire or fire.

24    They could make suggestions, but they actually couldn't fire

25    someone on the spot or hire someone on the spot, right?  They

1    had to go through their district managers?

2            MR. KEMPLE:  No.  They could hire and they could

3    fire, Your Honor.  They could also set salaries.

4        But to answer your question --

5            THE COURT:  Where is the evidence of that?

6            MR. KEMPLE:  It's in the declarations themselves.

7    I --

8            THE COURT:  The 27 declarations?

9            MR. KEMPLE:  In the 27 declarations.  In

10   Mr. Sabharwal's declaration.  I don't, frankly, think that's

11   even disputed.

12           THE COURT:  Is it?  In the 30(b)(6) -- I mean, do you

13   agree that these general managers could independently hire or

14   fire?

15           MR. JONES:  No.  I don't agree that they could

16   independently fire someone on the spot without getting human

17   resources involved, and their district managers involved in the

18   situation and discussion.

19       And, also, he says setting salary rates.  There is also

20   testimony there, Your Honor, that -- both in the declarations

21   and I believe the Sabharwal deposition -- and I'm reminding

22   myself to slow down -- that they have to use the pay rates that

23   are established by Wendy's.  They don't have the discretion

24   when hiring a crew member to say, I'm going to pay you 15 bucks

25   an hour.  No.  The rate of pay that's established is, you know,

 1    $8.25 to $8.75.

 2            THE COURT:  Again, that's something that would be

 3    subject to common proof.

 4            MR. JONES:  Yes, Your Honor.

 5            THE COURT:  It's a policy or it's not a policy.

 6            MR. JONES:  Exactly.

 7            THE COURT:  Okay.  I got it.

 8            MR. JONES:  And again --

 9            THE COURT:  Go ahead, Mr. Kemple.

10            MR. KEMPLE:  Mr. Jones is correct, there are limits

11    to how far they can go in terms of setting the pay, but in

12    terms of hiring and firing -- there are zones that they can get

13    within, but in terms of hiring and firing, they do have that

14    discretion.

15       Mr. Jones --

16            THE COURT:  Without final approval?

17            MR. KEMPLE:  Without final approval from the --

18            THE COURT:  Where is the evidence of that?

19            MR. KEMPLE:  It's in the declarations, Your Honor.  I

20    can find it and I will cite it to you.

21            THE COURT:  The 27 declarations on which I place

22    little or no weight?

23            MR. KEMPLE:  And in the 30(b)(6) deposition as well,

24    Your Honor.

25            THE COURT:  Okay.

1          MR. KEMPLE:  Mr. Jones is focusing on the way that

2     you put -- his examples of an absence of discretion are typical

3     to any business that manufactures a product nationally and that

4     wants uniformity.  They are, how are you going to train your

5     crew members as to the preparation of a Wendy's burger, for

6     example.  Yes, they're very particular about the lettuce and

7     the buns, and all that sort of stuff.  Not terribly surprising.

8          THE COURT:  He gives examples like, they can't change

9     the menu, they can't change the store hours, they can't -- I

10    have questions about this hiring or firing since I didn't see

11    it in the deposition, but if you think you can point it out,

12    I'd like to see it.  They, at least from his point of view,

13    were glorified nonexempt workers who got a salary, but the

14    reality is, every day that they came in, they knew at some

15    point during the day they were going to have to make french

16    fries, make a hamburger, take over the counter, all

17    nonexempt-type activities.

18        And it's not sort of a, I'm going to jump in here and show

19    you how to make a hamburger, it's, hey, Jim didn't show up

20    today, we're one short, I can't bring somebody else in because

21    Wendy's has this big emphasis on making sure that we stay

22    within certain hours in terms of our labor, and of course the

23    labor of a manager doesn't count against that, so let's make

24    our managers work 60 hours a week doing nonexempt work and not

25    allowing them to really exercise any independent judgment.

1          So my question again is, what are some examples where you

2     think they exercised independent judgment?

3               MR. KEMPLE:  Sure.  And we -- the declarations speak

4     to this, and the 30(b)(6) speaks to this.

5          In terms of training people to manufacture the burgers or

6     whatever meals are being provided to the consumers, that is

7     highly regulated.  Only the manager gets to see that operations

8     manual because it's propriety, obviously, not the people he's

9     training.  So the manager has to develop skills to how to train

10    people to do one thing or the other and to incentivize them.

11         But more --

12              THE COURT:  Training pursuant to a manual.

13              MR. KEMPLE:  Training pursuant to the specifications

14    set forth in the manual.

15         The example I give -- and, again, this is a tiny fraction

16    of what they do, and I want to get to the rest of it.

17         But the example I always give is Compac computers, maybe

18    Dell computers, whomever it might be, the people who assemble

19    Dell computers have no discretion to change the microchip --

20    and I'm not an expert in this -- but the wiring of the

21    circuitry and the way the product is developed.  That doesn't

22    mean that the people who build Dell computers don't require

23    management.

24         What the managers do, apart from training people to very

25    specific specifications, which involves dealing with human

1    beings, of course, and motivating them, they set cash flow,

2    inventory, scheduling, they hire and fire, they train.  And,

3    remember, this is between 18 and 40, typically young,

4    inexperienced workers in a very social setting, which requires

5    a lot of human skills, a lot of basic HR management skills.

6    This is -- where they're interacting constantly with customers

7    as well.

8              THE COURT:  What does "set cash flow" mean?

9              MR. KEMPLE:  They set the rates of cash flow.  They

10   set their projections for the store.  They set their budgeting

11   for the store.  There is no rigorous labor requirement for the

12   store.  The managers are given targets for their store to set

13   labor hours, but managers go above and beyond those budgets all

14   the time, because the managers are in the location managing a

15   $1.4 million business, average, being the sole exempt employee

16   in that store.

17       There are tremendous amounts of people skills, management

18   skills that are necessary to manage up to 40 people in that

19   environment.  They are -- they are doing reviews of employees.

20   They are -- some managers hire at enormous rates because the

21   turnover in their stores is very high for whatever reason.

22   Other managers spend less time managing -- or hiring and firing

23   employees, or reviewing employees, for example.

24       So it is true that, you know, we have one piece of lettuce

25   in a particular Wendy's burger, and, you know, two buns, a top

1      and a bottom, but that's not really the crux of the matter.

2      That is the case in the Burger King decision as well, which we

3      cited to the Court, where Burger King -- all of the fast food

4      chains, virtually any business that has a national uniform

5      product, has a very specific set of requirements as to how to

6      manufacture the product, but in that case the court found that

7      the manager was not exempt.

8          The UPS case that we cited likewise deals with

9      highly-standardized decision making.  And this, by the way, is

10     a California Court of Appeal decision applying the California

11     exemption, The UPS Wage and Hour Cases, dealing with stringent

12     UPS procedures and methods, daily operating plans.  And the

13     court says merely because the employer must -- or, rather, the

14     employer requires adherence to regulations, guidelines and

15     procedures does not mean that an executive does not exercise

16     independent judgment or discretion.  Goes on to talk about the

17     modern workforce, and all of the efforts that a manager does in

18     managing young employees in any business like this, where

19     you're managing to a specific set of criteria for the

20     production of the product itself.

21              THE COURT:  So I've got three former general

22     managers, I think two of them that went on to become district

23     managers, who are telling me, without question, skills were

24     transferable, there was no difference between the six or seven

25     stores they worked in, everything was controlled from the top.

1    Managers had little or no ability to exercise any judgment,

2    and, in fact, managers spent most of their day cooking burgers,

3    running the front counter, operating the drive-through, doing

4    nonexempt work, that was the majority of their day, day in, day

5    out, because of Wendy's failure to properly staff stores, and

6    numerous other examples that they really were just salaried

7    nonexempt employees who were required to work at least 50 hours

8    a week.

9            MR. KEMPLE:  So they have --

10           THE COURT:  So where is -- and I guess you didn't

11   even depose those individuals, so there is no evidence to

12   contradict those three individuals other than your 27 form

13   declarations written by lawyers.

14           MR. KEMPLE:  Well --

15           THE COURT:  So where -- where -- it's actually --

16   it's your affirmative defense, it's your burden.  And as you

17   can see, I'm highly skeptical that you've met, or you could

18   meet, that burden.  And we're sliding off into, at least in

19   terms of at this point, you obviously would call those people

20   at trial --

21           MR. KEMPLE:  If I may --

22           THE COURT:  But I don't -- on this independent

23   judgment, and exercise of independent judgment, why isn't it

24   enough that we certify the class and look at all these

25   policies?  What is it that you think would require --

1              MR. KEMPLE:  Yeah.

2              THE COURT:  -- independent proof to take this out of

3    a class action?

4              MR. KEMPLE:  The day-to-day experience of each

5    person.

6        If I may go back to -- you said we have no contradicting

7    evidence as to their just three declarants here.  Actually, we

8    do.  Mr. Azazy [sic], for example, signed a declaration in

9    2004, we're going back in time, but please let me fill in the

10   blanks here --

11             THE COURT:  Let me tell you up front, I didn't put

12   much weight in 2004 declarations because that's not -- that's

13   five years before the class was certified.

14             MR. KEMPLE:  Right.  But the position did not change,

15   Your Honor.  And, in fact, the only thing that changed was we

16   eliminated a co-manager position that was exempt, so that all

17   the exempt work now fell to the one GM.  And Mr. Azazy [sic]

18   testified that in -- as general manager, overwhelmingly his

19   work involved discretion and exempt work that we've been

20   describing.  His position didn't change other than to increase

21   the amount of work that he had to do as a manager involving

22   HR-related issues.

23       In addition, Mr. Azazy [sic], after he left Wendy's, put

24   together an employment resumé, and he signed it -- or it was an

25   application which he signed, under -- certifying the accuracy

1    of what was before.  Now, I don't want to put too much stock in

2    this, but in terms of cross-examination, what he described is

3    entirely an exempt general manager role.  So did plaintiff,

4    Mr. Davenport applied for work thereafter.  So did Mr. Mena,

5    their third person.  Again, describing the positions very much

6    in terms of an exempt general manager.

7        But I think it brings us back to the Court's totally

8    dead-on central focus, which is how are you going to establish

9    what each person did day-to-day over 11,000 weeks, which is

10   what the criteria -- what we're talking about here.  As the

11   Ninth Circuit in every California case says, you have to

12   evaluate this week-by-week, individual-by-individual.

13              THE COURT:  How do you ever have a class get

14   certified if a defendant can simply raise this exemption

15   defense?

16              MR. KEMPLE:  Very, very rare that it -- that a

17   misclassification case is exempt, as we've set forth in all the

18   cases that we cited in our brief.  In fact, some cases openly

19   state they can't find an exemption case like this that's

20   certified.

21              THE COURT:  I understand now why you fought so hard

22   in terms of the motion to amend the answer, but I still think

23   you have to decide cases on the merits.

24              MR. KEMPLE:  So --

25              THE COURT:  Hang on.  Let's set that aside.

1    So I accept that.  So I understand your point.  I get it.

2    I want to come back to Mr. Jones for a second.

3              MR. KEMPLE:  Your Honor, if I may address the earlier

4    point, because I don't want to --

5              THE COURT:  Real quick.  Go ahead.

6              MR. KEMPLE:  Thank you.

7    So the Court was asking, how can you prove this without

8    calling everybody to the stand?  And, obviously, I submit you

9    can't.  Averaging the experience of ten people is still calling

10   each individual to the stand and stating what he or she did,

11   then you average them, and that's an experience that no one

12   had, an average experience, and then you extrapolate to the

13   other 90 percent or so.

14   We have cited many cases that say that this would be

15   improper, indeed a violation of due process.

16   Importantly, the cases where classes are certified are very

17   few and far between, they're very different facts, like the

18   Avon case where the managed people were independent

19   contractors, independent contractors, who, by definition, are

20   doing their own thing or not being managed.  Very rare

21   circumstance where that happens, and always where there is

22   expert testimony verifying that this technique could be

23   utilized in an effective and statistically sound way.  There is

24   no testimony to that effect here, and I would submit that's

25   because no expert could possible testify that you could average

1    the experience of ten and extrapolate to the 109 [sic].

2        Forgive me if I'm -- for that, Your Honor.  I did want to

3    make that point.  I had a couple other points on deviation from

4    policies and such.

5              THE COURT:  Hang on.

6              MR. KEMPLE:  Sure.

7              MR. JONES:  You --

8              THE COURT:  Hang on.  I always write notes in terms

9    of briefs, and I'm looking at your -- Mr. Jones, your reply in

10   support of your motion for class cert.  It's the last brief

11   that was filed.  And you argue -- you're talking about the UPS

12   case, which Wendy's relies on, you point out the fact that UPS

13   involved only a single plaintiff, it was not a class action,

14   that Wendy's argues that this case somehow demonstrates that

15   predominance is lacking because plaintiff offered no common

16   proof regarding the administrative exemption inquiry.

17       While UPS makes general statements about the impact of

18   employer policies and procedures on an employee's exercise of

19   independent judgment and discretion, it is easily

20   distinguishable.

21       Then you write:  Most importantly, the single plaintiff in

22   UPS admitted that the very policies and procedures which he

23   argued eliminated his ability to exercise independent judgment

24   and discretion did not even apply to him in any of the

25   positions for which he argued he was improperly classified as

1    exempt.

2         And I wrote a note to myself saying, How does one determine

3    the ability to exercise independent judgment without calling

4    each individual?  How can you do that in a class action?

5         The word "independent" and the words "class action" in this

6    setting seem to be contradictory to me.

7              MR. JONES:  Your Honor, thank you for that.

8         I think that the passage that you just read from the UPS

9    case is the key.  And if this were similar to UPS, the answer

10   to your question would be we couldn't, because in UPS the

11   plaintiff was arguing, look at the operations manual, it

12   doesn't allow me any independent judgment and discretion, and

13   then at deposition he admitted, well, okay, yeah, that manual

14   didn't apply to any of the positions for which I claim I was

15   exempt.

16        We have the opposite here.  We have a situation, Your

17   Honor, where you can look at the manual, and you can look at

18   the testimony of the 30(b)(6), and you can look at the finite

19   task list and ask yourself one simple question as to each

20   issue, does this -- do these managers have the freedom to make

21   an independent choice, or are they simply applying their

22   knowledge of Wendy's policies and procedures?

23             THE COURT:  How do I determine that without hearing

24   from each of these managers?

25             MR. JONES:  You don't have to, Your Honor, because we

1    already have the testimony from the 30(b)(6) which tells you

2    that they don't have the discretion to deviate.  You have the

3    testimony from the district managers which tell you, look, one

4    of my jobs was to go into the restaurant to make sure that

5    everything they were doing was complying with Wendy's policies

6    and procedures.

7        You don't need to hear from every class member to make that

8    determination.  You can look at the finite task list and you

9    can look at the operations manual and make the call simply up

10   or down right there.

11           THE COURT:  You could put on a case which would

12   consist of the 30(b)(6) and the documents which you've

13   discovered setting forth Wendy's policies and rest?  I don't

14   need to hear from anyone else?

15           MR. JONES:  I think it's clear from those documents,

16   Your Honor.  In terms of context, I think it would be helpful,

17   frankly, to hear from a district manager.

18           THE COURT:  But then, obviously, lawsuits involve two

19   parties.  Now the defendants say, okay, we have an affirmative

20   defense, an affirmative defense of exemption, and, judge, the

21   only way we can prove our affirmative defense is to put on 108

22   individuals.  And I would think due process would allow them to

23   put on a defense.  You say no, but --

24           MR. JONES:  A defense.

25           THE COURT:  Right.

1          MR. JONES:  But not 108 people.

2          THE COURT:  Why not?  Why do you get to shape how

3    their defense is?

4          MR. JONES:  I don't get to shape how their defense

5    is.

6          THE COURT:  You do in a --

7          MR. JONES:  But the judge has the ability to control

8    his or her own docket.  At a certain point, testimony becomes

9    cumulative and you shut people down.

10      Because you look at the presentation from both sides in

11   this case.  You can look at the presentation from Wendy's, how

12   it views the position.  Like you said, the expectations are the

13   same.  I could get into the Joe's Crab Shack case and why

14   that's important, but we seem very focused here today.  This is

15   going to be very one-sided; it's either going to be a landslide

16   for the defense or a landslide for plaintiff if you look at the

17   two parties' submissions and the evidence that's been submitted

18   by both.

19      So I run into this problem, and I hear Mr. Kemple say,

20   Judge, you can never certify one of these overtime

21   classification cases.  I've been doing this for 17 years total,

22   I've been doing this particular area of the law for the last

23   13, I know Mr. Kemple would like to shut my business down but,

24   nevertheless, cases I bring still get certified.  And

25   infrequently they get tried.

1    The reason why you're not going to find a lot of appellate

2    law out there on trials in overtime misclassification class

3    actions is because it's rare they get tried.  You can look at

4    the Duran opinion from the California Supreme Court, I believe

5    they began the opinion by saying, We have before us a very rare

6    beast, an overtime misclassification class action that actually

7    went to trial.

8        Nevertheless, this is the experience, and this is the rub,

9    and this happened in the Taco Bell case that went to trial, the

10   defendant will bang its shoe on the table until it's blue in

11   the face and tell you that there is no way that you can ever

12   adjudicate their affirmative defense unless they hear from

13   every single person, which of course is an interesting argument

14   because they didn't talk to every single person before they

15   uniformly classified them all as exempt, regardless of the size

16   of the store, its location, sales volume, etc.

17       So one of the interesting things in the Taco Bell case was,

18   we heard this from the defense, we rested our case-in-chief and

19   they didn't call a single class member; not one.  They called a

20   couple supervisors and then settlement discussions ensued.

21   That is indicative of --

22               THE COURT:  So you didn't get a verdict?

23               MR. JONES:  I'm sorry?

24               THE COURT:  Didn't go to verdict?

25               MR. JONES:  Did not go to verdict, Your Honor.  It

1   settled after we presented our case-in-chief and I believe they

2   called four witnesses in total.

3            THE COURT:  Okay.  So without getting into the

4   details of these 27 declarations, written by attorneys, I still

5   know that there are at least 27 people out there -- well, you

6   found eight of them that now suddenly disagree with their

7   earlier declarations.  It doesn't help you, by the way, a whole

8   lot in terms of their credibility, but people tend to recant.

9   It doesn't.  I mean, again, it's just prime for

10  cross-examination.  It -- I would actually love to have a

11  mini-hearing with just your eight people.  I can already

12  imagine what they would say:  No, I don't recognize that

13  declaration.  No, I don't recognize that declaration.  No, I

14  can't specifically remember.  No, the lawyers just put it in

15  front of me.  Yes, I went ahead and signed it.  I mean, it

16  wouldn't be comfortable for any of these people.

17       Setting that aside, I still know that, at least from the

18  defendants' point of view, there are at least 19 people out

19  there of your 108 that wouldn't fit into this class, at least

20  generally, and that the defendant would want an opportunity to

21  put on some, if not all, of these individuals in terms of

22  helping me decide the liability issue.  And, again, I don't see

23  how I could not agree to that, how I could grant a motion in

24  limine that would limit a defense.

25       And, obviously, it concerns me because it's the simplest

1    way to defeat a motion for class certification.  It's simply,

2    let's raise an exemption defense and, guess what, you can't

3    certify the class.  I don't think the law is that clear, but it

4    tends to be that way.

5         And so the -- it comes back to you in terms of -- we're

6    going to take a short break, but when we come back, focus on,

7    again, what we sort of started with, why is this one different?

8    Why is this one the exception to what's almost become a general

9    rule?

10        And then come back to my original question of, no

11   bifurcation, no ten plaintiffs, what is this going to look

12   like?  That's question two.

13        The third question, which we haven't discussed, and which

14   really concerns me, and both parties didn't spend a lot of time

15   on it, probably because of my page limits, and that's damages.

16        Even though it can't, in and of itself, defeat class cert,

17   I've got to tell you, honestly, I think you greatly

18   oversimplify how you calculate damages in this case.  I know

19   you came up with a very creative and, you know, thought-out

20   manner in which a court could try this, and so I appreciate the

21   fact that you did at least try to -- tried to address it, but I

22   looked at that and thought, that's not feasible at all.  How --

23   how can I calculate damages for this class if I certify this

24   class?

25        So those are the three things we'll start with.  Let's take

 1   a ten-minute break.

 2            MR. JONES:  Thank you, Your Honor.

 3            MR. KEMPLE:   Thank you.

 4         (Recess taken, 11:20 a.m. - 1:15 p.m.)

 5            THE CLERK:  Recalling Civil S-14-931; Davenport

 6   versus Wendy's.

 7            THE COURT:  Okay.  Let's pick up where we left off

 8   from this morning.

 9       Mr. Jones, I gave you some specific questions that you are

10   now going to answer for me.

11            MR. JONES:  Thank you, Your Honor.

12       I believe that the first question that you gave me was why

13   are we different.

14            THE COURT:  Right.

15            MR. JONES:  Your Honor, as you know, the

16   certification question is going to be decided based upon the

17   evidence before you.  If you do go ahead and certify this case,

18   you retain the right to de-certify it at a later time should

19   evidence present that individual inquiries predominate.

20       I think the single biggest difference between this case,

21   certainly Zackaria, and also the other cases that were cited by

22   the defendant, is the evidence that's before this Court, which

23   is what will drive the Court's decision.

24       As we talked about a little bit before the break on the

25   independent judgment and discretion question, there is zero

1    evidence from the defendant that the class members had the

2    ability to deviate from company policies and procedures, which

3    was the evidence that was before the court in Zackaria, or that

4    the general managers had the discretion to exercise their

5    discretionary powers differently, which was also the evidence

6    before the court in Zackaria.  We don't have that here.  We've

7    talked about the operations manual, so I'll move on from that.

8        Two other very strong pieces of evidence that support

9    predominance, commonality and superiority.  The first are the

10   daily operations plans; those are the colored, laminated charts

11   that the plaintiff provided you with.  What is amazing about

12   Wendy's incredible degree of standardization is that, as a

13   general manager of the restaurant, you don't even have the

14   discretion to decide where you're going to work on a given day,

15   or what tasks you're going to perform, because that's dictated

16   to you by Wendy's through the daily operations plans, which are

17   the same for all stores.  And they tell you, look, on a

18   deployment level of 5, this is where the general manager is, at

19   the fry station.  On a deployment level of 6, you're at the

20   grill.  And they also tell you the tasks that you are to

21   perform when you're working in those positions.

22       I have never handled a case, nor am I aware of a case,

23   where you have directions from the defendant that dictate to

24   you where to work and what to do every day.

25       The next piece of evidence, Your Honor, and this goes

1    directly to the heart of independent judgment and discretion,

2    is the -- it's Exhibit 12 to the cert motion, it's the job

3    description for Wendy's, which, again, is uniform and applies

4    to all general managers.

5        And if you look at the job description, I'm just going to

6    read some of the headings to the Court:

7        Executes proper training and development through

8    established systems and practices.  That goes to when you're

9    training someone you use Wendy's training system.  And at the

10   end of the training program, you simply verify by signing off

11   on a form that it's been done.

12             THE COURT:  Where are you reading again?

13             MR. JONES:  No problem, Your Honor.  I'm on

14   Exhibit 12, it's internal Bates 122.  And it is the fifth point

15   down.

16             THE COURT:  Hang on.

17        Was it an exhibit to --

18             MR. JONES:  An exhibit to the cert motion.

19             THE COURT:  -- Mr. Sabharwal's depo?

20             MR. JONES:  Well, it was an exhibit to his depo, yes.

21   The depo exhibit number was 6.

22             THE COURT:  Hang on.

23        Okay.  I'm with you.  You're reading from where?

24             MR. JONES:  Bates 122.

25             THE COURT:  Okay.  Go ahead.

1          MR. JONES:  And you'll see the second sentence there

2  is, Executes proper training and development, key point,

3  through established systems and practices.

4      The next page, Bates 123, this is the job description for

5  the general manager position --

6          THE COURT:  I'm not -- I didn't see that last thing

7  you read.  You're looking at Bates 122, and where on 122 does

8  it say that?

9          MR. JONES:  The very last three-quarters of the page,

10  Your Honor, you'll see number 5.

11          THE COURT:  I see 5.

12          MR. JONES:  The second sentence.

13          THE COURT:  Executes proper training, development

14  through established systems and practices.

15          MR. JONES:  Correct.

16      Turning to the next page, which is Bates 123, under number

17  6, first sentence, Ensures people excellence culture through

18  the execution of the restaurant's overall human resource

19  programs.

20      Again, we know from the testimony of Mr. Sabharwal that the

21  human resource programs are developed by corporate, and they're

22  uniform for the stores.

23      Number 7 on that same page, Ensures store compliance with

24  company operating policies and procedures.

25      We move to the next page, Bates 124, number 8, Ensures

1   protection of Wendy's brand and assets through store compliance

2   with company policies and procedures.

3        Evaluates store performance at specified intervals using

4   company inspection forms.

5        Same page, under the knowledge and ability section, this is

6   what they look for from a general manager, the first three

7   bullet points:

8        Ability to learn and apply Wendy's operating systems and

9   procedures.

10       Ability to learn and apply Wendy's policies and procedures.

11       Ability to learn and apply Wendy's human resources policies

12   and procedures.

13       It's plaintiff's position that this goes to the heart of

14   the inquiry under independent judgment and discretion as to

15   whether they have the freedom to make an independent choice, or

16   whether they apply their knowledge of standardized policies and

17   procedures.

18       So the evidence in this case, Your Honor, is in stark

19   contrast to the evidence that was before the court in Zackaria.

20   You asked Mr. Kemple to come up with examples for you that are

21   in evidence of independent judgment and discretion.  And just

22   as I asked Mr. Sabharwal at his deposition, he struggled to do

23   so.

24            THE COURT:  That's one of the things I was doing,

25   obviously, over the hour, and I have to tell you, I disagree

1    with your characterization of this depo.  I'm not sure we're

2    reading the same depo.

3        But page 64, question:  What is your understanding as to

4    the difference between a managerial work task and a

5    nonmanagerial work task?

6        He answers it easily.  He doesn't hesitate.

7        And was Wendy's expectation that its salaried general

8    managers would work a 50-hour workweek minimum?  Is that

9    correct?

10       Answer:  No.

11       Starting on page 307:  As you sit here today, is there

12   anything else we're missing as far as large buckets of tasks

13   that Wendy's expected its general managers to perform?

14       So far we have interviews, selection of employees,

15   orientation meetings, coaching, training.

16       Answer:  Sure.  They would be involved in scheduling.  They

17   would be involved in crew reviews.  They would be involved in

18   management.  Interviews of the management members.  They would

19   also be responsible for making sure they have adequate staffing

20   for the right day parts.  They would have P&L accountability,

21   profit and loss statements.  Accountability daily and weekly.

22   There were follow-up -- they were following up on systems

23   research, whether it was cleaning charts, whether it was daily

24   drop charts, product drop charts.  They were attending district

25   manager meetings.  If there was conflict of policy issues

1    within the store, restaurant, conflict between two employees,

2    they would do investigation for that.  If there was cash

3    missing or cash handling procedural violations, or just

4    reinforcing, they would do that.

5        This is not a complete list.  There is a bunch of things

6    that it would do stuff for the team, the morale for the team.

7    They would do a birthday party for the team.  That was at their

8    discretion if they want to do that to celebrate, that was

9    theirs.

10       I mean, without hesitation, he answered that question.

11   Which, again, I -- I mean, I tend to question your

12   characterization and your reliance on this deposition.

13            MR. JONES:  Your Honor, there were multiple portions

14   of the deposition that we relied upon that are in evidence.

15            THE COURT:  Right.  But I have to look at the entire

16   deposition.

17            MR. JONES:  I understand, Your Honor.

18            THE COURT:  And you're relying heavily on this

19   deposition to try to prove to me that there is commonality and

20   that, you know, the common issues predominate.  And if you're

21   relying on this, I guess we tend to disagree that this is

22   something you could rely on to help you meet your burden of

23   proof.

24       But go ahead.

25            MR. JONES:  If you take a look, Your Honor, at what

1   Mr. Sabharwal was testifying to, there was multiple references

2   in the testimony to charts.  What he's referring -- and

3   inventory.  What he's referring to is the fact that Wendy's has

4   inventory sheets that you use, and, for example, when you're

5   doing an inventory count, Do we have 12 boxes of hamburgers on

6   hand?  No, we have 6.  Well, that means we order 6.  The charts

7   that he was referencing, very similar to that, to ensure --

8   these are standardized charts that are used in every Wendy's to

9   ensure that the procedures that Wendy's has established are

10  being followed.  This, I believe, does go to the heart of the

11  independent judgment discretion.

12      The first part of the question -- or the response that you

13  read was regarding the minimum 50-hour workweek requirement.

14  Mr. Sabharwal's testimony is directly at odds with the very job

15  description that we were just looking at on Bates 125.

16          THE COURT:  There are also schedules that have been

17  submitted.  I mean --

18          MR. JONES:  That --

19          THE COURT:  -- there are so many documents in which

20  it's evident that it -- again, there is this whole discussion

21  in this deposition, and argument over, as to what is actually

22  done as opposed to what is somewhat -- I can't remember the

23  word -- it's not expected, but what is -- what they want to see

24  in managers.

25      And, again, its manager's ability -- should have the

1   ability to work 50 hours a week, but that doesn't mean that

2   they are actually working 50 hours a week.  Even -- there are

3   schedules that were submitted from Mr. Davenport that showed

4   one week he worked 46 hours, another week he worked 29 hours.

5   And although the schedules show five days a week, ten-hour

6   shifts, that's not what actually happened.  And that's where I

7   want to come back to in reading.

8        The other thing I wanted to do was go back and read all

9   these cases again.

10       That's sort of the central issue that judges have to decide

11   in these class certification motions, and that is this issue of

12   when you have the standardized policies and operation manuals,

13   is that enough to say that common issues predominate?

14       Marlo is one case, the Wal-Mart case is another, that sort

15   of sets out this issue that the judges have to decide.  And

16   that is, when the plaintiff is contending that he has satisfied

17   his burden of establishing predominance by submitting evidence

18   of centralized control and uniform policies and procedures, and

19   there is a -- and there is a blanket exemption policy, which we

20   have in this case, does that eliminate the need to make a

21   factual determination as to whether class members are actually

22   performing similar duties?

23       Specifically, the existence of a policy classifying in this

24   case -- in our case the general manager as exempt from overtime

25   pay requirements does not necessarily establish that these

1   general managers were misclassified because the policy may have

2   accurately classified some employees and misclassified others.

3        And in Marlo, the court writes, To the extent Marlo argues

4   that UPS's policies and procedures establish sufficient

5   evidence of predominance, his argument still fails.  Marlo

6   asserts that the district court had before it various documents

7   explaining activities that -- in that case they call them FTSs

8   -- the FTS were expected to perform, and procedures that they

9   should follow in issuing staffing assignments and training

10  hourly employees.  Even assuming that those documents establish

11  that UPS's policies and procedures apply to all, Marlo has not

12  explained how they establish predominance as to these

13  particular exemptions.  In particular, the fact that UPS

14  expects the FTS to follow certain procedures or perform certain

15  tasks does not establish whether they actually are primarily

16  engaged in exempt activities during the course of the workweek,

17  and it cites to California Code of Regulations, Title 8,

18  Section 11090(1)(A)(1)(e) and (2)(f), or whether they

19  customarily and regularly exercise discretion and independent

20  judgment.

21       Wal-Mart is similar.  It's -- you know, it's the discussion

22  that's laid out in Wal-Mart.

23       So it's really this question of is there -- is there

24  sufficient evidence in this case.  And I know that, again, I --

25  you submitted numerous exhibits similar to what was submitted

1    in the cases relied on by the defendant, but in cases in which

2    the court still declined to grant class certification because

3    of this issue of the need to look at what the actual overall

4    requirements of the job were.

5          This is from the Rite Aid case, which you rely on, and

6    which did grant class certification.  And in that case, Rite

7    Aid treated its -- evidence indicated that Rite Aid treated its

8    store managers as one homogeneous group.  And while some

9    variations may exist, the store manager position at Rite Aid

10   was, in fact, sufficiently similar from store to store in all

11   important respects such that class treatment was appropriate.

12   And the court so found in that case.

13         The court found that there were significant aspects of the

14   case that could be resolved on a class basis, and then they

15   listed five in particular:

16         One, the actual requirements of the job, which you're

17   suggesting from these documents that was the same throughout;

18         Realistic expectations of the employer;

19         Proper classification of store manager tasks as exempt or

20   nonexempt;

21         Rite Aid's state of mind, knowledge, historical actions;

22         And then policies with respect to its classification and

23   treatment of store managers.

24         And the court concluded that these and other common issues

25   would, in fact, predominate over any individual issues that may

1    arise in this case.

2        That's at the heart of this discussion.

3            MR. JONES:  Your Honor, I -- I don't disagree with

4    you.  This case is going to rise or fall based on the evidence

5    and the Court's view of the evidence.  And the plaintiffs

6    believe that we have submitted strong evidence in the form not

7    only of documents and policy and procedures, but also

8    deposition testimony as we noted at the beginning.  It's the

9    only deposition you have before you in this entire case.  And I

10   would note, and as I know the Court will, when evaluating the

11   evidence for certification, in each of the cases that you just

12   talked about, the defendant submitted evidence that

13   demonstrated a variance in the duties and tasks performed by

14   the population, in this case the general managers, based on

15   various factors.

16       I mean, in Zackaria they relied on individual differences

17   based upon whether the store was in a metro area, the type of

18   store it was, the clientele, the sales volume of the store.

19   Like I said, its location.  We don't have that evidence here in

20   this case from the defendant, unlike the cases that you just --

21   that you just talked about.  So --

22           THE COURT:  But I do have some evidence from a 2004

23   survey -- which, again, this is five years prior to the date

24   that you're seeking class certification for but at least it's

25   some evidence of a survey done by the company -- which, in

1    effect -- I'm sort of interested in the way you asked the

2    question at the deposition, but there was a question, has Rite

3    Aid -- not Rite Aid, I'm sorry -- Wal-Mart -- Wendy's ever, in

4    effect, done any type of -- tried to document its decision to

5    treat each and every one of these employees as exempt, and the

6    answer kept coming back to 2004 and 2014.  Which, at least from

7    Wendy's point of view, is significant amount of evidence that

8    their classification was proper, given the answers that these

9    people gave to what were they actually doing.  What were they

10   doing on a week-by-week basis?  What were they doing on an

11   hour-by-hour basis?

12           MR. JONES:  The daily operations plan is evidence of

13   that, Your Honor.

14           THE COURT:  But the charts that were developed out of

15   these surveys is contradictory evidence.

16           MR. JONES:  The two -- the Court needs to understand,

17   and this is in the Sabharwal deposition, the 2004, quote,

18   unquote, study was done by Paul Hastings' law firm in a nearly

19   identical fashion to what occurred in 2014 with Mr. Kemple's

20   law firm, whereby they went out, where they -- please take a

21   look at the declarations, I think you'll find that much like

22   2014 it's a check-the-box, they're identical.

23       So they went out with these people, you know, the men in

24   the black suits arrive and, Hi, we're from Wendy's and we'd

25   like to ask you a couple questions about your job.  And they go

1    through the list.

2        You know, what we would like to see, Your Honor, is for the

3    class members to actually have the opportunity to present their

4    own evidence, not the evidence from the attorneys hired by

5    Wendy's to interview them and to phrase the questions in such a

6    way and only ask about certain tasks.

7        And that really comes down to another common issue --

8                THE COURT:  That raises -- that's the other question

9    I wanted to address with you.  Because even though the

10   classification is an affirmative defense, the burden is still

11   on you to meet the requirements of class certification.

12       And I'm thinking, why do I only have three declarations

13   from potential class members?  There are -- I don't know

14   exactly how many class members you represent, but there are

15   footnotes and hints -- and, by the way, the next time either of

16   you submit briefs with this many footnotes, I don't know what

17   I'm going to do.  But if you don't know, the one thing that

18   everyone knows about me is how much I hate footnotes.  You two

19   must have worked on law review, because you love footnotes,

20   both of you.  Just an aside.

21       But there are indications that you represent, or at least

22   have access to, far more than just Mr. Davenport and the other

23   two declarations that you are relying on heavily.  Why didn't I

24   see more?  Why didn't you try to do more to meet your burden

25   that these common issues are predominant?

1          MR. JONES:  Your Honor, a couple points to that.

2      First of all, it's always been my practice to attempt to

3  provide the Court with detailed factual declarations.  I've

4  always found that a few -- not a few, but less, detailed

5  factual declarations that are different are more than, you

6  know, 27 basically things all saying the same thing.  At a

7  certain point it becomes cumulative.  And in this particular

8  case, I think it's important to note that two of the

9  declarations you have are not just from general managers, they

10  held dual hats.

11      So Mr. El-Azazy and Mr. Mena were both general managers

12  during the class period and also district managers.  As a

13  district manager, their responsibility was for observing a

14  number of general managers who worked in their district.  So

15  they really are talking about not just themselves, they're

16  talking about the expectations that were set and the

17  observations of what some 30 plus general managers were doing.

18  And we only have a class of 106 [sic].

19      So that is the reason, Your Honor, I felt that the Court

20  would appreciate a little bit of brevity as opposed to 50

21  declarations all typed the same, all saying the same thing.

22          THE COURT:  Here is the other thing I think that's

23  missing when I read these declarations, and I understand,

24  again, why objections were made to them, they just raise

25  questions in my mind, they're not very specific.  And that's my

1    other concern.  I can almost go line through line.

2        I'm looking at Mr. Davenport's declaration, for example:  I

3    routinely work more than 50 hours per week in order to meet

4    Wendy's -- Wendy's service expectations and to avoid exceeding

5    the labor budgets established by Wendy's.

6        What's he relying on?  Does he have -- does he have some

7    documentation?  If so, I would think someone would tell me

8    specifically what documentation he has.

9        He has:  On average I worked in excess of 55 hours per week

10   during my employment.

11       What's he relying on since managers didn't clock in and

12   clock out?  So is he relying simply on his memory?

13            MR. JONES:  Do you want me to answer either of those

14   questions, Judge?

15            THE COURT:  Hang on.  Let me get through this.

16       Here it is:  At each of the seven restaurants where I

17   worked, I spent the great majority of my time -- what does that

18   mean, "great majority of my time"?  Not specific -- performing

19   the following tasks -- which are clearly nonexempt tasks --

20   cashiering, taking food orders, wrapping and bagging food.  One

21   of the reasons why the type of work task that I performed did

22   not vary from restaurant to restaurant was due to the fact that

23   Wendy's required its GMs to spend time working in hourly crew

24   member positions.

25       Again, I assume that -- I know a lawyer wrote that and he

1  signs off on it, but I'm not sure how he has a basis to make

2  that statement.  There is a lack of foundation there.

3      He references Wendy's daily operations plan and the

4  laminated charts which were the same for each restaurant.  I

5  agree with that.

6      Talks about Wendy's being very focused.  I assume that's

7  based on his own personal experience as -- and the training he

8  received as a GM.

9      He talks about meeting with his district manager every

10  week, and talking about the importance of standard operating

11  procedures and labor.

12      He talks about what he did not have the discretion to do.

13  There are 13 things listed.  Does that mean he never had the

14  discretion to do it?  Doesn't say that, just says that I didn't

15  have the discretion, or that he never exercised the discretion.

16      He was never able -- never -- oh, usually not able to take

17  an uninterrupted 30-minute meal period.  Again, I don't know

18  how he knows that without some documentation.

19      And then it talks about how he fairly and adequately

20  protected.

21      The problem is, and it may be because managers didn't keep

22  documented records, they made schedules, and then they got paid

23  and there is a flat salary, so there is a lack of documentation

24  in that respect.  That's concerning to me too, the lack of

25  specificity.  It's -- I don't know.  I -- it's like a case in

1   which you're going to put up -- or want to put up these three

2   individuals who will talk generally about their experience, and

3   then not really be able to give specifics.

4       And once we get into the specifics, then we're getting away

5   from these issues, again, that common issues predominate.  It's

6   really the individual issues that predominate and that I have

7   to look at in deciding whether classification was proper or

8   not.  I don't know how I get past that without more.

9           MR. JONES:  Your Honor, I've gone through with you

10  today a lot -- not a lot, we haven't gone through the

11  operations manual, which is lengthy and contains numerous

12  procedures that they have to follow, but with respect to

13  Mr. Davenport, you brought up labor budgets, how does he know

14  about that?  If the Court looks -- and, really, perhaps this is

15  my failing, but the declaration is, in my mind, to be read in

16  conjunction with all of the other evidence that's been

17  submitted.  Some of the other pieces of evidence that directly

18  talk about the labor budget, where you have to be at zero to

19  minus five to goal with respect to overtime and labor, that's

20  addressed in the performance review for -- it's right in the

21  performance review for the general managers.  Those are

22  Exhibits 17 and 18 to the certification motion.

23      When Your Honor asked about hours worked, you're correct,

24  Wendy's did not require them to punch a clock, so he is

25  testifying based on his memory as to the number of hours he

1   worked.

2      We -- one of the issues you wanted me to talk about was

3   damages, and I will in a moment, but --

4            THE COURT:  The issue of superiority as well.

5            MR. JONES:  Yes, Your Honor.

6      And as you are aware, under Anderson versus Mt. Clemens

7   Pottery, the defendant -- and under the Labor Code and the wage

8   order that is at issue here, the defendant is required to keep

9   records of hours worked.  And when they fail to do so, there is

10  a relaxed standard that applies whereby the class is able to

11  establish hours worked by just a reasonable inference, and then

12  the burden shifts to the defendant to come forward with

13  evidence to disprove their testimony.

14      So it cuts both ways, because the defendant had the

15  obligation, they didn't do so, and so how are they going to

16  come up with evidence to disprove?  This goes a little bit to

17  damages and bifurcation in a moment, but I want to make sure

18  that I address all of the questions you raised with respect to

19  Mr. Davenport.

20      One of the passages from the deposition was that Wendy's

21  required us to work in hourly crew member positions.  Again,

22  that has been established through the daily operations plans,

23  and also the documents that were filed under seal, the

24  positions at Wendy's, that demonstrate to the Court, okay, when

25  the general manager is working in the fry position, these are

1    the tasks he's performing.  When the general manager is working

2    in the walkup counter position, these are the tasks they're

3    performing.

4        They're not only outlined on the daily operation laminated

5    charts themselves, they're also specifically outlined in

6    Wendy's operations manual.

7            THE COURT:  That begs that question, though, as to --

8    it sounds like a Bill Clinton answer, but what does work mean?

9        If they're walking up and demonstrating something to an

10   employee that they're supervising, is that exempt or nonexempt?

11   Are they acting in the role of a trainer/manager, or are they

12   actually performing a nonexempt type of work?  How long are

13   they there?  I mean, it -- that's sort of the specificity

14   that's lacking in Mr. Davenport's declaration.

15       I had to do all these tasks.  Well, managers -- every

16   manager is different, but some managers jump right in and help

17   out the crew, other managers will jump in for five seconds and

18   say, This is how you do it, now you do it.  Everybody manages

19   differently.  And you've got to be able to lump 108 managers

20   together to get certification.  And there is not a whole lot of

21   evidence from you, again, other than manuals, that say this is

22   what we would like to see you do.

23       Where is there evidence that this is what was going on

24   there?  And that lends itself to individualized testimony,

25   which, again, you don't want because you won't get your class

1    certified.

2         That's my concern here, that you haven't given me enough.

3    It doesn't meet the Rite Aid-type situation.  Again, it's more

4    the Wal-Mart-type situation.

5              MR. JONES:  I believe it's the opposite.  But I also

6    think it's important for the Court to kind of compartmentalize

7    the two issues that are before it.

8              THE COURT:  In Rite Aid the court granted cert, in

9    Wal-Mart it didn't.

10             MR. JONES:  Right.

11        There are two very separate and distinct issues, and Your

12   Honor could decide that individual issues predominate with

13   respect to the percentage of time, the 50 percent test that

14   we've been talking about.  That's the first prong of the

15   executive exemption, primarily engaged in exempt work.

16             THE COURT:  I'm not there.  I'm still on the

17   individual judgment part.

18             MR. JONES:  Well, the independent judgment and

19   discretion prong is that the evidence from that is in front of

20   the Court with respect to the operating policies and

21   procedures, and the fact that they can't dictate from them --

22   deviate from them, rather, I'm sorry, and the fact that their

23   supervisors specifically come to the store to make sure they're

24   being followed.

25             THE COURT:  But balanced against deposition testimony

1    in which the 30(b)(6) declarant says there are a number of

2    other tasks in which they did exercise independent judgment,

3    including it's clear they did have the ability to hire and fire

4    certain employees.  So, again, you -- I think you were wrong on

5    that issue, they clearly had the ability to do so.  And it was

6    the lower level positions, but that was the general manager's

7    right.

8        They made up schedules.  That's exercising independent

9    judgment.  I mean, I just read just a small passage from his

10   deposition.

11       All I'm saying is, that's not their burden to come forward

12   with that.  They submitted it to me.  It's your burden to show

13   me that's an exception, that's not going to predominate, that's

14   not what this case is about.  And I don't -- I don't see it --

15   other than the manuals, you're relying heavily on these

16   manuals, manuals are -- and every case talks about manuals.

17   That's sort of the bottom rung.  That's the bare minimum you

18   expect plaintiffs to rely on.  But there is so much more to

19   these cases than just manuals.  Most companies have

20   standardized procedures.  Most companies have standard

21   operations.  Most companies have these type of details that

22   you're relying on.

23       The question is:  Is Davenport the -- the general rule or

24   is Davenport the exception?  If he's the exception, you don't

25   get to certify your class.  If it's general, Davenport and 107

1  other people are similarly situated, there is no question I

2  certify this class.  And that's what I'm looking for.  I keep

3  going to this evidence looking for did you meet your burden of

4  proof, and I'm having a hard time seeing it.  That's where I'm

5  at right now.

6          MR. JONES:  Here is what I think the Court -- I think

7  this will be of some assistance.  You brought up an excellent

8  characterization that I believe is a common issue on the

9  independent judgment and discretion for all class members, and

10  Mr. Sabharwal testified they scheduled, you know, they -- they

11  did some training, they did inventory, they used the -- the

12  charts to address various procedures.  There is no dispute here

13  that they all did that.  The question that's a common one is

14  whether or not when doing so they were just following the --

15  using their knowledge of the policies and procedures or whether

16  or not they were using freedom to exercise independent choice.

17  That is the question that's common for everyone.

18      So, Your Honor, I think the evidence that you're looking

19  for, if you will, has been supplied not only by the plaintiff,

20  but by the defendant.  And the common question is going to be

21  whether or not -- the defendants' view is, whether or not those

22  tasks require independent judgment and discretion as defined by

23  the law or not.

24      When we get further into this case, I would welcome the

25  opportunity to present to the Court, and I believe there is

 1   some testimony on this from Mr. Sabharwal, exactly how the

 2   schedules are done.  Okay.  They're done using a

 3   computer-generated software system where the people's names get

 4   put in, Wendy's has the -- we provided the uniform task list to

 5   you, the tasks are already in the software program, you

 6   basically push a button.

 7        Similar with the inventory, you're using a pre-prepared

 8   sheet to go around to count the number of hamburgers and the

 9   amount of lettuce.

10             THE COURT:  Who does what task?  Who gets placed

11   where?  Who remains employed?  Who doesn't remain employed?

12   Those are all managerial tasks.  Those are all tasks you would

13   expect an exempt individual to perform.

14        And, again, that's -- the deposition testimony is that

15   that's what managers are doing.  There is nothing, other than

16   Mr. Davenport and the other two individuals and their general

17   allegations -- I mean, there is really no discussion about

18   that, they weren't deposed.

19             MR. JONES:  Nor was Mr. Davenport.

20             THE COURT:  That's not your obligation, to depose

21   your own clients, I understand that.

22             MR. JONES:  I was very surprised, Your Honor.

23             THE COURT:  Whether you're surprised or not, it's

24   still your burden.  And I've only got three individuals who

25   give me very general descriptions of this is what I did, and

1    then you want me to take that with these documents and say

2    common questions are going to predominate in this case.  And

3    you see my concern that that may not be enough.

4            MR. JONES:  I see your concern, Your Honor.

5        I would note that a number of cases have confirmed that the

6    testimony of one witness is enough for class certification

7    purposes.  And that's why the Court retains the power to

8    decertify this case.  If we get into the merits discovery, Your

9    Honor, and the defendant comes back, and he says, Look, look at

10   all the deposition testimony we have that demonstrates that

11   they all do their jobs differently, that, you know what, as it

12   turns out they can deviate from the company policies and

13   procedures, and they can go ahead and make their own

14   discretionary calls, that's a different story, that's a

15   different set of facts that aren't currently before this Court.

16           THE COURT:  Or I could do what another court did, and

17   that is deny the motion to certify the class without prejudice.

18           MR. JONES:  You certainly retain that power.  It's a

19   discretionary call, Your Honor.

20       I would advocate to you, as I have, and I think we have in

21   our papers, that the better approach would be to certify the

22   class, especially on the evidence that's before this Court from

23   both parties.

24       Would you like me to continue on this or did you want me to

25   move on and address some of your other questions?

1                   THE COURT:  Go ahead.  Just go ahead and move on.

2                   MR. JONES:  One of the things, when Mr. Kemple was

3      making his argument, I think it's important for the Court to

4      note he's mixing and matching with the federal primary duties

5      test under the FLSA and California's test for exemption, which

6      are separate and distinct.

7           I noticed in the papers he cited to Baldwin and then also

8      to Burger King.  Those are two FLSA cases, and it's quite clear

9      in California those don't apply.  That's set forth in the Savon

10     and Ramirez opinions.

11          You asked me, also, on the issue of damages.  I think the

12     case law is clear in the Ninth Circuit that damages alone --

13     individuals having to come in and prove up their damages is not

14     a reason to deny certification.  But, nevertheless, I

15     understand the Court's concern to be more in terms of, you

16     know, what is this trial going to look like, and I appreciate

17     that.

18          The damages -- what we're missing in the damages analysis

19     is simply the number of hours worked per week.

20                  THE COURT:  Manage -- manageability requirement --

21     this is under superiority -- includes consideration of the

22     potential difficulties in notifying class members of the suit

23     that -- I don't think that's an issue -- calculation of

24     individual damages, and then distribution of the damages.

25          The other issue that's raised in these cases is sort of an

1   interesting analysis, but if the likelihood of recovering

2   significant damages is higher by way of an individual lawsuit

3   as opposed to a class cert, that would cut against granting

4   class certification.  And the defendants have raised argument

5   here that Mr. Davenport probably stands to make a whole lot

6   more money by going forward individually, I saw the number

7   $94,000 or something, as opposed to becoming a member of this

8   class.

9        I want you to address that as well, because there may be

10  other managers out there that you -- and you know, you

11  represent -- that's what's so interesting to me, I don't know

12  what you know, but is that true, that you at least have

13  contacted or represented at least 50 of these 108 individuals?

14           MR. JONES:  It's Mr. Righetti's firm.  I'm not sure

15  if the number is 50.  It may even be greater.

16           THE COURT:  Have any other lawsuits been filed?

17           MR. JONES:  None.

18           THE COURT:  Okay.  So, they're just waiting to see

19  what happens here?

20           MR. JONES:  Yes.  No other lawsuits have been filed.

21           THE COURT:  Okay.

22           MR. JONES:  There are no suits pending in other

23  courts.

24           THE COURT:  Okay.

25           MR. JONES:  And on the recovery issue, Your Honor,

1    what you have here is you have a mix.  I mean, the amount that

2    these people are going to recover is dependent upon how many

3    weeks they worked for the defendant during the class period.

4    And admittedly, yes, you have some people who worked the entire

5    class period.  You have other people who worked as few as six

6    weeks.  So I believe --

7              THE COURT:  That's against class certification.

8              MR. JONES:  No, that's not what the case law says.

9    What the case law says, and I think it's the Zinser opinion, is

10   that if all of the recoveries are low, that favors class

11   certification, but the converse is not also true, meaning that

12   if the recoveries are high that it cuts against, it simply

13   means that that factor is not present.

14             THE COURT:  It's interesting, though, you avoided

15   this whole damage discussion by simply saying, Judge, bifurcate

16   the damage issue, which isn't going to happen and wouldn't

17   happen.

18             MR. JONES:  That's what you're telling me now.  And I

19   appreciate that, and that's why I -- over the break I wanted to

20   address that issue.  I didn't know if you wanted to talk any

21   more about the individual recovery issue or not.

22             THE COURT:  You better talk about it.

23        But go ahead, keep going.

24             MR. JONES:  Okay.  I want to make sure I've answered

25   the Court's question on the individual recovery.

1        Yes, you do have a range.  My read of the case law, if --

2    if the damages are high, that doesn't cut against class

3    certification, it just means the converse, which is, if the

4    damages are low, it favors class certification isn't present,

5    so it's a wash.

6        And I believe one of the cases that they're citing to is a

7    situation where the recovery for all of the class members was

8    over $50,000.  We don't have that here, obviously.

9        With respect to the issue of damages, getting back to that

10   for a moment, the only missing element that we have for damages

11   are the number of hours worked.  Otherwise it's a mathematical

12   equation, you take their salaries, divide by 52 and 40 to get

13   the hourly rate, multiply that by 1.5.  Right?  So what we're

14   missing are the number of hours worked.

15           THE COURT:  Right.

16           MR. JONES:  We talked about the burden shifting under

17   Anderson versus Mt. Clemens Pottery.  Here is how we have

18   addressed this situation in other cases:

19       One of the cases is called Zimmerman versus Fireman's Fund

20   that we tried, a class action case in front of Judge Duree in

21   Novato.  And after liability, what we used, and I think a

22   similar procedure could be used in this case, is a claim form,

23   signed under penalty of perjury, that is sent to the class

24   members simply asking them to indicate, based upon their

25   knowledge, how many hours they worked per week.  And then the

1    defendant would have the opportunity to cross-examine them.

2        Again, what we would submit is that they would be required

3    to have an offer of proof --

4            THE COURT:  Cross-examine 108 people?

5            MR. JONES:  Your Honor, it's funny --

6            THE COURT:  It is funny.

7            MR. JONES:  -- because we use -- it's not funny.  We

8    used that procedure and you know how many they cross-examined?

9    None.

10           THE COURT:  But it still cuts against class

11   certification, right?  Judge, the way you're going to determine

12   damages, oh, by the way, you have to hear from 108 people.

13           MR. JONES:  No, Your Honor.  What I said was to use a

14   claim form.

15           THE COURT:  Yeah.  And then allow the defendants to

16   cross-examine.

17           MR. JONES:  Based on an offer of proof, yes.  I mean,

18   is there some evidence that they can come forward and present

19   to demonstrate that they -- because that's their burden, they

20   have to demonstrate that they have evidence to contradict.  Do

21   they have any evidence?  At a certain point they're going to

22   have to show their cards.  And it may be for a certain person

23   who claims they worked 60 hours a week that they actually do

24   have some evidence in the form of vacation request forms, or

25   the like, to show that that person didn't work the hours that

1    they were suggesting.  But for the vast majority of the people,

2    the answer would be no.

3         Another procedure that we've used, Your Honor, when you get

4    to damages, is to use special masters and very focused

5    inquiries into the number of hours worked.  That's -- and

6    that's also in the case law of one of the innovative procedural

7    tools that this Court has available to it.

8              THE COURT:  I wish I had time for innovative

9    procedures, but that's part of, again -- it's really not a

10   factor and I'm not considering it in any way, and the record

11   should so reflect, but that's the reality here in the Eastern

12   District of California.  We can't be innovative.  We can't

13   be -- I can't devote the amount of time that you would want to

14   devote to this one case.  And that's why I'm pushing you a

15   whole lot on how is this going to get tried.

16             MR. JONES:  I understand.  And I appreciate it, Your

17   Honor.

18        With respect to the special masters, that does not require

19   the courts, other than supervision of the findings from the

20   special masters.  We have used, in other cases, special masters

21   from JAMS, arbitrators and the like who are -- you know, when

22   you get down to the issue of damages and the standard of proof,

23   and you're just looking at hours worked, you're really not

24   talking about that much testimony or cross-examination.  You're

25   really just talking about, okay, you're saying 55 hours a week,

1   you know, defendant, what evidence do you have to disprove

2   that?

3       We're not talking about all day long examinations and

4   introduction of voluminous documents.  It just doesn't happen

5   that way.

6           THE COURT:  What you're arguing legally is, yes,

7   there are individual issues but they just don't predominate.

8   That's your argument.

9           MR. JONES:  That's correct, Your Honor.

10          THE COURT:  Every case has individual issues, they

11  just don't predominate.

12          MR. JONES:  You're never going to find any case where

13  you have zero individual issues.  That's not the test.

14      The test is whether or not they predominate and whether or

15  not they can be managed.  And that's what I'm trying to present

16  to the Court.  And I appreciate the opportunity.  As we have

17  this dialog, I think we're coming up with various forms of ways

18  to manage individual issues such as hours worked.

19      Now, I want to make sure I'm answering all the Court's

20  questions.

21      We began discussing briefly that the Court has the

22  authority to certify some of the claims and deny certification

23  on others if the Court has problems with the 50 percent test

24  issue.  I believe, based upon the evidence, especially the

25  daily operations plans, Your Honor, I've -- I've never seen in

1    a case, especially in the fast food industry, where you have

2    the defendant dictating where -- which position people are

3    going to be working in, for what amount of time and what

4    they're going to be doing.

5        I mean, this sort of evidence is the evidence that cuts

6    through the defendants' arguments that everybody is doing

7    everything differently.  I mean, this is the sort of evidence

8    that just is -- it does not come around very often.  I've

9    certainly not seen it before in any of the cases that I have

10   done.

11       We talked a little bit about Dukes and due process --

12           THE COURT:  Right.

13           MR. JONES:  The defendant does not have the due

14   process right to assert its affirmative defense against each

15   and every class member.  That's not what Dukes says.  Dukes was

16   not decided on due process grounds.  Dukes was decided based

17   upon the very unique statute in play in Title 7 which

18   specifically allowed the employer to demonstrate a

19   nondiscriminatory purpose for the hiring.  That's what Dukes

20   was based on.

21           THE COURT:  Then they respond:  Dozens of such cases

22   have been decided.  Fact-intensive questions of exemption are

23   considered on the Rule 23 analysis, and defendant is permitted

24   to assess exemption as to each class member, precisely why

25   courts hold these cases may not be certified, citing their

1   exhibits at Docket 60-1, testimony on pages 16 through 18.

2       And then a footnote, And see In re Wells Fargo Home

3   Mortgage Overtime Pay Litigation.  If the adjudication of a

4   defense would necessitate individual inquiries, and those

5   inquiries would predominate over inquiries into common

6   questions, certification should be denied.  The court has been

7   unable to locate any case in which a court permitted a

8   plaintiff to establish the nonexempt state of class members

9   through representative testimony.

10      They cite Akaosugi v. Benihana.  The court held, The

11  misclassification claim would require an individualized

12  analysis of how each manager spent his or her time and what

13  percentage of that time was spent on exempt tasks.  Were this

14  class to be certified, the trial would devolve into various

15  mini trials, wherein the fact finder would need to determine,

16  on an individual basis, how class members spent their time;

17  certification is not appropriate where resolution of the

18  misclassification claims and defenses require a fact-intensive

19  individual analysis of each employee's exempt status; Chavez

20  versus Lumber Liquidators, Alakozai v. Chase Investment

21  Services Corp, Rea v. Michaels Stores.

22      They submitted an exhibit, I guess it was a mediation

23  brief, in which they cite, one, two, three, four, five, six,

24  seven, eight, nine, ten, eleven, twelve cases which they argue

25  are similar to this case where certification was denied.

1      I mean, it's -- it's a huge task for you, I think you

2    recognize that, to distinguish this one from those.  And

3    whether, again, you've convinced me that these issues

4    predominate, whether there is sufficient evidence.  And we're

5    repeating ourselves, and I've read the briefs, obviously, but

6    that's the issue.

7            MR. JONES:  My point, Your Honor, was there is no

8    quote, unquote, due process right.  What you just cited to were

9    a bunch of cases where judges, based upon the evidence before

10   them, which I don't know what it was in every single case,

11   obviously, made the call that individuals predominated over

12   common issues.  That's the same analysis that you're faced with

13   at the end of the day here.

14      The defendant wants you to believe that in a Wendy's store,

15   which are all operated the same, which have the same menu

16   items, that are sold at the same prices, that are prepared in

17   the same way, that have the same classifications of employees

18   working in each store, where the general managers all work

19   pursuant to the same job description, where the general

20   managers are required by Wendy's operating procedures to follow

21   certain standards, where they're told where to stand and what

22   to do, they want you to believe that based -- despite all of

23   that evidence of uniformity, and the common policies, and the

24   testimony from the person most knowledgeable designated, they

25   want you to believe that despite all that uniformity, what

1    these people do day-to-day varies wildly from person-to-person.

2              THE COURT:  Right.

3              MR. JONES:  And I don't believe that the evidence

4    demonstrates it.  I don't believe that the testimony

5    demonstrates it.  Certainly not --

6              THE COURT:  That's a merits argument.  That's

7    still -- I know I have to consider, somewhat, merits-based

8    questions, and that's sort of your big complaint -- not

9    complaint but response to their opposition, which is they fall

10   right into a merits analysis as opposed to a certification of

11   the class analysis.  That's a closing argument in a liability

12   case.

13        And, obviously, the response to that is, that's half the

14   picture, Judge.  Yes, you focus so much on what is common that

15   you ignore what isn't common.

16        And the way you deal with the 27 declarations is you ask me

17   to strike them.  Well, I didn't do that.  And then you deal

18   with, well, they're lawyer-generated so you should give them

19   little weight.  Okay.  But it's still some evidence that this

20   case is going to require individualized proof.  And every case

21   requires -- every case has that.  All of these cases have that.

22   And the question is this:  Is that predominant or is it not

23   predominant?

24        You can put on -- and then it comes down to these practical

25   questions of, you probably could put on your case with just

 1    this documentation and a 30 -- you would at least try, I don't

 2    know if you'd do that -- and a 30(b)(6) person and then argue

 3    liability from that.

 4        And you sort of have to take that position in many ways to

 5    get class certification.  Judge, you don't need to hear from

 6    these individuals, obviously you should hear from the class

 7    representative, but he is representative of everything that was

 8    going on in those stores.

 9        But then the defense gets to put on a defense.  And these

10    cases don't give you a lot of guidance on what happens in that

11    situation.  What happens when it's clear that the entire

12    defense case is, I'm going to put on 70 people that -- that

13    absolutely disagree with what this one disgruntled former

14    employee is saying should be a class case.

15        I mean, that's as simple as I can put it.  In common sense

16    terms, and if I was talking to a jury, that's how I would

17    describe the case to them.

18        You tell me why, under that scenario, those individual

19    determinations don't predominate.

20             MR. JONES:  One of the --

21             THE COURT:  Oh and, by the way, you're going to have

22    to hear from -- or at least hear -- have 50 people

23    cross-examined on damages if liability is proven.

24             MR. JONES:  I think one of the common issues that

25    will -- kind of solves the Rubik's Cube, when you get down to

1   the heart of this, is on task classification, which is a mixed

2   question of fact and law.

3      You see the defendant using managerial titles, managerial

4   sounding titles to describe tasks that the plaintiff contends

5   are nonexempt.  We've talked about some of them today with

6   scheduling, we talked about them with inventory.  You know, is

7   counting up boxes and putting it on a form, is that really a

8   managerial task?  I take argument with that.  With many of the

9   tasks that they have identified.

10      And that is a common, class-wide issue, because what you

11   have here -- and I believe this is similar to the Greko versus

12   Diesel case that we cited, is you have experiences and duties

13   that are similar, and you have different titles being placed on

14   them.  I mean, this isn't a situation where one store is

15   operated completely differently than the other.  In fact, we

16   know that the converse is true from the documents we have.

17   This is a situation where you have all of the managers working

18   in the food production area of the restaurant.  It's not a

19   situation where you have a group of managers who are out doing

20   marketing initiative.

21              THE COURT:  Not all the time.  Not for the entire 50

22   hours.  I mean --

23              MR. JONES:  Well, it's --

24              THE COURT:  I understand there are these beautiful

25   little charts, and they want the managers to move through, and

1   they're expected to move through, and they're expected to be on

2   the floor.  I get all that.  And that is subject to common

3   proof because there is a policy, there is direction given to

4   these managers.  That's still only half the picture.

5       And I'm not sure you still answered my concern or my

6   question about the defense case.  Do I ignore it or do I say,

7   No, those issues exist but they don't predominate?

8       Is that what you're arguing?

9            MR. JONES:  No.

10            THE COURT:  Okay.

11            MR. JONES:  Your Honor, the plaintiff's burden is to

12   put forward a trial plan through which the plaintiff can

13   prevail on his case.  That's what we've done.

14       It is not the plaintiff's burden to put forward a trial

15   plan that allows the defendant to prove its affirmative defense

16   of exemption.  That is the defendant's burden at trial.

17       Mr. Kemple has made no suggestion to me at any point

18   through this case or to this Court as to how he intends to try

19   his affirmative defense.  I have a feeling what he's going to

20   tell you is you're going to have to hear from all 108 people to

21   decide whether or not this group that we originally determined

22   would be uniformly classified as exempt actually fits the legal

23   definition.

24       There are procedural tools that the Court has available to

25   it to either allow that or not, which is putting a limit on the

1    number of persons that can testify.  At a certain point, the

2    evidence becomes cumulative.

3         The other point that I think that's important, Your Honor,

4    on this issue, we keep talking about how do they spend the

5    other part of their time, and this is different than

6    independent judgment and discretion, this is the 50 percent

7    test, it is a 50 percent test, once you get to 51 percent, the

8    inquiry is over.

9         So, you know, all of the little finite tasks that are --

10   minute tasks, rather, that people don't spend a lot of time

11   performing, what you're going to find in this case is you're

12   going to find large portions of time on similar tasks as we've

13   demonstrated, cooking food, ordering, preparing food, etc. --

14            THE COURT:  How have you demonstrated that?

15            MR. JONES:  Well, I've demonstrated it not only

16   through the declarations we provided, but also through the

17   documents we provided.  It specifically stated in the daily

18   operations plan that that is what you're supposed to be doing.

19        When you're working in the fry position, you are

20   maintaining and portioning fries and nuggets, frying and

21   cleaning, prepping desserts and drinks, pulling and wrapping

22   the bun, prepping the heel of the bun.  I mean, you're --

23   you're performing production-type work.  That's what's --

24   that's why these daily operations plans are so significant,

25   Your Honor.

 1                    THE COURT:  Okay.  Take a breath.

 2         Mr. Kemple.

 3                    MR. KEMPLE:  Thank you, Your Honor.

 4                    THE COURT:  We've talked about a lot.  Go ahead.

 5                    MR. KEMPLE:  I'm going to try and do it in less than

 6     an hour and 15 minutes, certainly.

 7                    THE COURT:  Actually, I have a quick question.  The

 8     schedules that were submitted, I can't find them now, but as I

 9     indicated showed some -- some days -- or some weeks working 50

10     hours, some weeks working 29 hours.  How was that determined?

11                    MR. KEMPLE:  It's determined by the general manager

12     in the store.  And you're right, even Davenport sometimes

13     worked 25 hours.

14                    THE COURT:  So there are documents that show how many

15     hours --

16                    MR. KEMPLE:  No.  No.  No.  That's the schedule, Your

17     Honor, that's not necessarily how many hours they actually --

18                    THE COURT:  So, that --

19                    MR. KEMPLE:  Assuming for a moment they actually

20     worked the 25.  That's just a schedule.

21                    THE COURT:  That only shows he scheduled himself

22     for --

23                    MR. KEMPLE:  He may have worked 80 hours.  I couldn't

24     tell you.

25                    THE COURT:  So if it says 29, the only thing I can

1   take from that is he scheduled himself for 29 hours?

2            MR. KEMPLE:  That's correct.

3            THE COURT:  Okay.  I don't know how many hours he

4   actually worked?

5            MR. KEMPLE:  No.  We don't.

6            THE COURT:  Okay.

7            MR. KEMPLE:  Your Honor, first I wanted -- a little

8   bit of housekeeping.  The Court already touched upon it.

9        On the hiring and firing point, we did cite the Court the

10  evidence that these managers can hire and fire.  But an

11  important point is, if you look at the declarations, some

12  people say, I have an absolute right to hire and fire.  Others

13  say, I have the right but I consult with my DM or higher, or

14  HR, before I do it.  There is a great example of in the

15  exercise of independent judgment and discretion.  It's

16  exercised differently by different people.

17       But to correct plaintiff's counsel, yes, they do have the

18  ability to hire and fire.

19       Another point -- and, by the way, that's found, for

20  example, in paragraph 3 of Mr. [Sic] Kaut's declaration,

21  paragraph 62 of Mr. Molina's, paragraph 16 of Ms. Robles.

22       These declarations are by no means identical.  They're not.

23  And, in fact, the point of the declarations is to underscore

24  the variance from one general manager's life to another general

25  manager's life.  And we've attached charts to our opposition

1    that illustrate that variance, I think, very vividly and,

2    indeed, colorfully.

3        And if I may -- I'm not going to spend a lot of time on

4    this, but just to refresh the Court's recollection --

5             THE COURT:  By the way, on your point they're not

6    identical, you might have used different headings, since the

7    headings seem to be pretty similar and the form seems to be

8    pretty similar.

9             MR. KEMPLE:  And that's by design, Your Honor.

10            THE COURT:  I know it is, because the lawyers drafted

11   them.

12            MR. KEMPLE:  It's more than that.

13       In order to compare one person's experience to another, you

14   need to have some uniformity in the questions that you're

15   asking them so that you can show the great variance from one

16   person to another.  And that's what everybody does in all of

17   these cases, is you ask the class members to describe their

18   work experience --

19            THE COURT:  What everybody does isn't necessarily

20   persuasive to certain judges.

21            MR. KEMPLE:  That's fair.

22            THE COURT:  I'll just leave it at that.

23       But go ahead.

24            MR. KEMPLE:  Of course.  Of course, Your Honor.

25            THE COURT:  Those are your color-coded charts?

1          MR. KEMPLE:  Those are my --

2          THE COURT:  I've seen them.

3          MR. KEMPLE:  I've got a bunch of them.

4          THE COURT:  Right.

5          MR. KEMPLE:  Mr. Jones focuses -- he keeps coming

6    back to burger assembly, acting as if this is the job of a

7    general manager, whether you put a piece of lettuce or a piece

8    of tomato on something.

9      The Court has obviously read Rajeev Sabharwal's deposition.

10   It's all about discretion and how general managers manage these

11   rather large businesses with a rather large number of

12   employees.  Telling somebody how to assemble a burger is a

13   tiny, tiny fraction of what they did.  But even as to that

14   fraction, this is what the court in Donovan versus Burger King

15   said, it said, The fact that Burger King has well-defined

16   policies and that tasks are spelled out in great detail is

17   insufficient to negate this conclusion that they're engaged in

18   exempt work, ensuring that company policies are carried out

19   constitutes the very essence of supervisory work.

20     Even as to just that little bit of training people how to

21   do X, Y or Z, that is classic management and exemption work.

22     Counsel points out that Donovan versus Burger King is an

23   FLSA case.  That actually strengthens our point.  The FLSA

24   looks not only to the day-to-day exact functions of the person

25   being evaluated, but to the employer's expectation, and

1  therefore in some sense is more generalized in terms -- or more

2  common in terms of its evaluation than California's extremely

3  rigorous and detailed 51 percent test.  So, the fact that

4  that's an FLSA case certainly does not minimize its

5  application.  Even in the FLSA context, the courts have found

6  that even that minutiae work is exempt.

7      But the broader point is this is a tiny, tiny fraction of

8  what these general managers do.  And counsel for plaintiff, I

9  think wisely from his perspective, keeps coming back to

10  lettuce, buns and such.  I mean, that's not what the GM

11  position is all about.

12      THE COURT:  There is, though, this daily operation plan

13  that --

14          MR. KEMPLE:  There is --

15          THE COURT:  -- does say lettuce, buns and --

16          MR. KEMPLE:  No, actually, it doesn't, Your Honor, if

17  I may.

18      So the daily operations plan comes, I think, in 14

19  different formats, depending upon staffing levels.  What the

20  daily operations plan says is -- and we attached the far more

21  common one, which I think is 11 persons, to our -- to our

22  brief.  It's Exhibit 20, but I don't think the Court needs to

23  turn to it.  It lists three bullet points, and they are, you

24  know, keep an eye on the restaurant, maintain customer

25  satisfaction, and keep an eye on fries, for example.

1        Look, if the operations leader, the GM, were only

2    performing those three tasks, the operations leader would be

3    doing substantially less work than a crew member would be when

4    assigned to fries.

5        What everyone has testified to, other than these three

6    declarations, is -- and one of them did as well, and I'll get

7    to that in a moment, one of their three even concedes this

8    point under oath -- the operations manager -- or the operations

9    leader, when it's the GM, is keeping an eye on that station

10    while performing the overall GM duties.

11              THE COURT:  Some restaurants, as I recall, have a GM

12    and an operations manager.

13              MR. KEMPLE:  There can be.

14              THE COURT:  There can be.

15              MR. KEMPLE:  When the GM is not there, for example,

16    yeah, you can have a -- they're called shift supervisors,

17    focusing on various tasks.  Right.

18        But, really, the op's leader is intended to be the GM of

19    the restaurant.  But that doesn't mean they're not doing their

20    general manager duties, it's just, in this configuration keep

21    an eye on this, keep an eye on that.  And each one of these

22    bullet -- configurations expressly says, by the way, you're

23    still managing the restaurant.

24              THE COURT:  Looking at your Exhibit 20, it doesn't

25    really have the words along the lines of keep an eye on --

1          MR. KEMPLE:  This one doesn't --

2          THE COURT REPORTER:  I'm sorry, counsel, you need to

3    slow down.

4          MR. KEMPLE:  This one has, Ensure customer

5    satisfaction, aware of restaurant conditions at all times,

6    problem solve and task --

7          THE COURT:  Right.

8          MR. KEMPLE:  Yeah.

9          THE COURT:  Okay.

10         MR. KEMPLE:  So, look, if the operations leader was

11   assigned to this position in the restaurant, and we've given

12   you the job descriptions for those positions, they'd be doing

13   vastly more things than are listed here.

14      So obviously they're not sliding into the crew position.

15   They're -- as everybody has testified, these are just, you

16   know, sort of configurations as to where to keep an eye while

17   you're doing your general manager's duties.

18      And, interestingly, one of the three declarants that

19   plaintiff put forth, Mr. El-Azazy, testified exactly to that,

20   granted in 2004 --

21         THE COURT:  Right.

22         MR. KEMPLE:  -- but the point is, his new claim -- I

23   think this is his third declaration in this case, now he says,

24   Well, in 2005 that all changed, and, though, yeah, in 2004 as

25   op's leader I was doing all management work, and it's not what

1    plaintiff is now characterizing, there was some phantom change

2    at Wendy's --

3              THE COURT:  Slow down.

4              MR. KEMPLE:  -- that just eliminated all the GMs'

5    management work.  It didn't happen.  And, indeed, it doesn't

6    make any sense.

7         One would ask Mr. El-Azazy, Well, gee, where did all that

8    management work go?  And, in fact, what happened after this was

9    they eliminated the co-manager position so that the general

10   manager had far more management work to do.

11        So -- and by the way, it's also contradicted -- and I know

12   the Court is weighing this stuff, but these declarations, every

13   one of them, refutes the notion and is completely consistent

14   with Mr. El-Azazy's prior declaration in 2004 that, to be

15   clear, when you're in the op's leader role, you're not just

16   doing -- you know, frying fries, or what have you.  Far from

17   it.

18             THE COURT:  (Reading) When I work as operations

19   leader, I supervise crew member performance and manage overall

20   restaurant operations.  I move through the six operating zones

21   in the restaurant and identify and solve any problems within

22   each zone.  This management technique is referred to as

23   Mobility with Impact.  I evaluate and coach crew member

24   performance in each zone to ensure that my restaurant is

25   operating most efficiently.  I provide coaching and training to

1   crew members as needed, employing the Talk To Me, or TTM,

2   management technique, which is a method of coaching crew

3   members.  I ensure that food safety procedures are being

4   followed.  I evaluate each station's rush ready status.  I

5   complete performance observation checklists for crew members to

6   provide more detailed coaching.

7        See, that's interesting.  Mr. Jones would argue that that's

8   an example of lack of independent judgment.  They're basically

9   just filling out a form provided to them by Wendy's, there is

10  no independent judgment exercised within that.  Your argument,

11  obviously, is, of course there is because they're evaluating

12  someone, right?

13       (Reading) Occasionally I may slide into a position to

14  demonstrate a particular technique.  And under the Mobility

15  with Impact Program, operations leaders should not slide into a

16  crew position for the purpose of filling in for someone.  My

17  district manager evaluates me on how well I employ the Mobility

18  with Impact and Talk To Me techniques.

19       Then he says, I occasionally slide into position when I

20  think the crew needs help getting their work covered, but this

21  situation doesn't present itself often.

22       Now he's changed completely since --

23            MR. KEMPLE:  Because there is some phantom

24  elimination of management work at these restaurants.

25       He also said back then that the op's leader was merely 25

 1   percent of his time, now he claims it was a hundred percent.

 2       So, even just looking at one person, you can see the

 3   credibility disputes --

 4               THE COURT REPORTER:  I'm sorry --

 5               THE COURT:  We missed --

 6               MR. KEMPLE:  I've got to stop speaking so fast.

 7               THE COURT:  Go ahead.

 8               MR. KEMPLE:  I apologize.

 9       Even looking at just one person, you can see the obvious

10   credibility disputes that would arise as to his testimony.

11       The Court has correctly put its finger on, you can't look

12   to, sort of, company-wide policies anyway to establish what's

13   happening on the ground.

14       The Court cited a couple cases, they are really legion,

15   including out of the Ninth Circuit.  You've got the Marlo case,

16   the Ninth Circuit decision that is, obviously, hugely on point

17   here that the Court read.  You've got the Wang versus Chinese

18   Daily News case.  In California you've got the UPS Wage and

19   Hour Cases, exactly the same proposition as evaluated by the

20   California Court of Appeal, including an op's -- a daily

21   operating plan, stringent performance -- or, rather, protocols

22   as to how people are going to do [sic].  There is a very

23   lengthy and thoughtful discussion on that point.

24       You've got --

25               THE COURT:  Let me ask a specific question again.

1          In the plaintiff's reply in support of the motion, this is

2     the last brief that was filed, it's argued that:  Wendy's does

3     not dispute that due to the standardization of its restaurant

4     operations, none of the GMs had the ability to change the hours

5     of operation of the restaurant, where he or she worked, change

6     the uniforms worn by the crew, change the food sold, change the

7     prices of food items, eliminate menu items, add new menu items,

8     modify existing menu items, initiate promotions for food items

9     sold at the restaurant, change the precise procedures that are

10    used to make and assemble the food items, change the

11    ingredients used to make food items, change the location where

12    the products are stored, change the materials used to wrap and

13    bag the food, hire hourly paid shift supervisors or restaurant

14    managers -- that's incorrect -- or offer starting wages or wage

15    increases to employees outside of the wage rates dictated by

16    the director of operations.

17         You agree with all of that?

18              MR. KEMPLE:  Not all of it.  Some of it.

19         So most of the stuff that you just read is dealing with the

20    assembly of the burger or the menu items.  Sure, look, an

21    individual general manager can't say, My Wendy's is now going

22    to have a triple cheeseburger.  Obviously, that's true.

23         Some of them, though, Mr. Sabharwal actually took issue

24    with.  For example, changing the condiments and such.  There is

25    discretion.  It would be an unusual circumstance where you

1    would do that, where you would run down to the grocery store

2    and replace something.  I can't remember the precise

3    circumstance he was talking about.  There is some discretion

4    there.

5         But, yeah, by in large, in terms of the assembly of the

6    burger, or whatever it be, the chili, you can't change Wendy's

7    chili or the Frosty formula.

8         On other things, though, yes, you can hire and fire, yes,

9    you can change wages, within a scale.  This is the way every

10   national enterprise works, by the way.  And, moreover, this is

11   ignoring the vast majority of the work which is, of course,

12   managing people, doing all the things it takes to make young

13   people in these jobs perform well.

14        I was briefly going through the cases, and I don't want the

15   Court to miss the Ninth Circuit case of Friend versus Hertz

16   Corporation.  Because, quote, Plaintiffs-Appellants had not

17   shown --

18             THE COURT:  Slow down.  Wow.

19        Go.

20             MR. KEMPLE:  Because, quote, Plaintiffs-Appellants

21   had not shown that those, bracket, noncompliant, bracket,

22   policies actually controlled the day-to-day experiences of

23   Hertz employees, end quote, they failed to establish

24   commonality and predominance.  And then they affirmed denial of

25   the class cert.

1          Gales versus Winco Foods, the same.  Weigele versus FedEx

2     Ground Pack -- all of these are in our briefs -- the same.

3     Ugas.  Munoz.  Many of these are dealing with training

4     policies.  That was brought up.

5          I mean, every employer has general protocols and

6     suggestions how to manage and how to train.  The trick to being

7     a manager is getting people to perform, particularly when the

8     people don't have access to those criteria and such.  That's

9     exactly the holding of the Burger King case, amongst others.

10         Simply, what happens is what goes on, on the ground.

11    Again, those 27 declarations not only show that their

12    experience was different from plaintiff's, it's different from

13    one person to the other.

14         It's not about summary judgment, the point is variance.

15    Whether we win or lose, the point is, you can't get to this

16    issue unless you put people on the stand and cross-examine each

17    and every one of them.

18         And, again, plaintiff's declaration, he said he worked at

19    seven restaurants.  No, he didn't.  I mean, there are so many

20    things that each person would be subject to cross-examination

21    on.

22         There are additional issues as to liability on some of

23    these claims.  You don't get overtime pay unless you worked

24    beyond 40 hours in a workweek.  The Court just cited the

25    example of plaintiff, we don't know, but scheduling himself for

 1  29 hours.  So, even the individual questions beyond what we've

 2  talked about the basic exemption question, if you overcame

 3  that, then you'd next have to prove the liability on the meal

 4  or rest break components.  That also involves questions as to

 5  how long did you work?  Did someone know and condone your

 6  working?

 7      Meal and rest breaks, plaintiff -- the Court read it, I

 8  believe -- said, I usually didn't take meal and rest breaks.

 9  Well, again, just -- even if you got beyond the exemption

10  issue, there are additional components that would have to be

11  addressed for the actual elements of the claim which themselves

12  are very individualized.  There is a rich body of law on meal

13  and rest breaks, for example --

14          THE COURT:  Slow down.  You're killing my court

15  reporter.

16          MR. KEMPLE:  -- meal and rest breaks as to whether or

17  not those are certifiable.

18      Even putting aside the entire exemption issue, you then get

19  to the elements of the claims.

20      Damages.  You know, it's interesting, there is no question

21  that in order to establish damages in this case, you would have

22  to put every single person up on the stand and subject them to

23  credibility disputes.  There are no records here.

24          THE COURT:  You would have to.

25          MR. KEMPLE:  I would.

1                    THE COURT:  You would.

2                    MR. KEMPLE:  One would.

3                    THE COURT:  His point is, he doesn't have to.

4                    MR. KEMPLE:  It's immaterial who is putting it up.

5      Again, for class certification purposes, you look at the

6      defenses as well as the elements of the claims.  It's very well

7      understood in the case law.

8                    THE COURT:  Is that very well understood, Mr. Jones?

9                    MR. JONES:  Not in the way that the defendant is

10     putting it, Your Honor.

11                   THE COURT:  I'll give you a chance to respond.

12                   MR. KEMPLE:  Quote, if the adjudication of a defense

13     would --

14                   THE COURT REPORTER:  I'm sorry.

15                   THE COURT:  Whoa.  Man --

16                   THE COURT REPORTER:  I need a break.

17                   THE COURT:  Okay.  Let's take a break.  Ten minutes.

18         (Recess taken, 2:35 - 2:56 p.m.)

19                   THE COURT:  Mr. Kemple, go ahead.

20                   MR. KEMPLE:  Thank you very much, Your Honor.

21         Plaintiff's counsel was just stating that he doesn't

22     believe that the question of -- the individual questions that

23     come into play in an affirmative defense are relevant to the

24     Rule 23 inquiry.

25                   THE COURT:  You speak way too quickly.

1          MR. KEMPLE:  Am I doing it again?

2          THE COURT:  You're not going to have a record.

3          MR. KEMPLE:  Let me do that again.  And thank you for

4    that caution.

5      Plaintiff's counsel just represented, as I understand it,

6    that he did not believe that Rule 23 takes into account the

7    various fact issues that would come into play in an affirmative

8    defense.

9      Well, first of all, if that were the case, what have we

10   been talking about for the past many hours?  Secondly, what has

11   all the briefing been about?  But, of course, that's not the

12   case.

13     And to quote from a case, quote, If the adjudication of a

14   defense would necessitate individual inquiries and those

15   inquiries would predominate over injuries --

16          THE COURT:  Stop.

17          MR. KEMPLE:  Am I still going too fast?

18          THE COURT:  Way too fast.

19          MR. KEMPLE:  Oh, wow.  Okay.  Sorry.

20     Quote, if the adjudication of a defense would necessitate

21   individual inquiries, and those inquiries would predominate

22   over inquiries into common questions, certification should be

23   denied, end quote.  That's the In re Wells Fargo Home Mortgage

24   Overtime Pay Litigation case that we've cited.  There are many

25   cases that so hold.

1         But the -- I mean, obviously, that's the very inquiry we've

2     been exploring through all of our briefing and in this hearing

3     and is clearly the law.

4         I wanted to turn to the question of damages that the Court

5     raised earlier.

6         Looking just at the overtime claims, for example, counsel

7     corrects me that you can earn overtime either daily, in excess

8     of 8 hours, or weekly, in excess of 40 hours in the State of

9     California, of course.  But there are no records, as everyone

10    concedes, that would determine how long someone actually

11    worked.  And indeed, just looking at the anecdotal evidence

12    from plaintiff's three declarants in this case, Mr. Davenport

13    says he worked 55 hours per week on average, that's 5 overtime

14    hours -- or rather 15.  Mr. El-Azazy testified that in his

15    exercise of the GM duties he worked 80 hours per week.

16    Mr. Mena said 50 hours per week.  The complaint says an average

17    of 50 hours per week.  These folks are all over the board.

18        Not only does this illustrate that the question of how many

19    hours they actually worked varies from person to person, and

20    would, of course, be subject to cross-examination, it also

21    illustrates that these people are doing this job in a very

22    different way, with different skills that they bring and

23    different, you know, abilities and different pressures and

24    different emphasis, all of which is also confirmed by every

25    declaration that we've put forward.

1          Also on the question of damages, plaintiff cites to the

2    Anderson case.  It's Anderson versus Mt. Clemens, he's

3    referenced it three times now.

4              THE COURT:  All right.

5              MR. KEMPLE:  It's not even a class action case.

6          And, moreover, it's a 1946 decision, obviously pre-Comcast

7    and its progeny.  And even Anderson holds that each plaintiff

8    must, quote, Prove that he has in fact performed work for which

9    he was improperly compensated, end quote.  And, quote, Produce

10   sufficient evidence to show the amount and extent of that work

11   as a matter of just and reasonable inference, end quote.

12         At the end of the day, as seems axiomatic, in order to

13   establish what the damages would be, in this context it's going

14   to require 108 people taking the stand and testifying to their

15   individual experiences, all subject to cross-examination.

16         The issue of superiority was raised, and I did want to

17   touch upon that briefly as well.

18         A class action is superior -- this is the Ninth Circuit --

19   if there is no realistic -- this is a quote -- quote, No

20   realistic alternative exists if no -- quote, No realistic

21   alternative exists, end quote, to the class action that would

22   allow individuals to recover on their claims.

23         There is clearly an alternative here.  This case is quite

24   extraordinary in this regard, actually.  The $94,000 figure

25   that I referenced is not Mr. Davenport, that is the average

1   based upon plaintiff's contention of at least 50 overtime hours

2   per week.  So, if you just used 50 overtime hours, and you

3   averaged the wages of these GMs, there is some variance of

4   course, that comes to $94,000 by the time you add in the

5   waiting time, penalties, and the other things that they're

6   looking for.  An average of $94,000 at issue, plus attorneys'

7   fees and costs, for each of these individual claims.

8        What the case law says is, is there a realistic alternative

9   to a class action?  Which is -- you know, class actions are,

10  obviously, the rare exception, per the U.S. Supreme Court, for

11  a number of reasons.

12       Litty versus Merrill Lynch & Company, quote, Given the

13  amount of money potentially at stake, any class member is so --

14  who is so inclined would have both the motivation and the

15  avenues available to pursue their claims individually.  These

16  circumstances weigh against a superiority finding, end quote.

17       Here there is almost six figures at issue per person before

18  attorneys' fees.  Huge incentive for an individual to pursue

19  this.  And -- and this is what really makes this case

20  extraordinary -- these individuals already -- at least 59 of

21  them already are represented by counsel on these issues.  The

22  class action procedure clearly is not the only available remedy

23  to these people.  There is plenty of money to incent these

24  people to bring individual actions at which these myriad

25  individual questions could be addressed properly and consistent

1   with due process and just sense, if you will.

2        The Marlo case, I think, really warrants underscoring.  And

3   the Court has underscored it a couple of times and has read it.

4   If I just may read one passage from it, because I think it's

5   so -- every one of these cases the plaintiffs point to a job

6   description, which, by the way, if you read it, it's a

7   manager's description, and the documents that plaintiff points

8   to here.  And what the Ninth Circuit said four years ago in

9   Marlo was, quote, Documents explaining the activities that

10  managers are expected to perform and procedures they should

11  follow -- I'm ellipting -- does not establish whether they

12  actually are primarily engaged in the exempt activities during

13  the course of the workweek -- ellipting -- or whether they

14  customarily and regularly exercise discretion and independent

15  judgment, end quote.

16       Many, many, many cases thereafter make the same point,

17  including the Zackaria case which is -- you're correct, Judge,

18  is just dead on with this case.

19       The question is:  What does each person do each day?  And

20  that is a very varied and fact-intensive question.  There is

21  simply no means to establish that on an individual basis.

22  Which, again, returning to plaintiff's argument, yes, you must

23  establish exemption on an individual basis.  That's what the

24  Ninth Circuit has held, that's what every circuit in this

25  country has held, that's what countless district court

1   decisions have held in denying class cert more often than not,

2   vastly more often than not, because you would have to reach all

3   of these individual questions.

4       So, I think we briefed this issue well.  I hope the Court

5   feels that we've done a good job in the papers.

6       I think the declarations -- and I heard the Court's message

7   earlier, but this is what we do, what most do, I don't know

8   that that's relevant, but you go out and you get declarations

9   asking people, so what is your life like?  And you do ask

10  similar questions because you want to be able to compare them

11  from one person to another to show the variance at issue here.

12  Those declarations don't go away.  They're signed under penalty

13  of perjury.

14      Respectfully, Your Honor, I -- my team does not cross the

15  line.  Ashley Farrell, I wish she were here because I'd love

16  for you to hear her stories.  I know why she remembers the

17  person waited in the car.  She's a relatively young associate

18  and she's fantastic.  And she takes copious notes and she

19  recalls every one of those interviews vividly.  I love having

20  her on my team.

21      We talked at length about what was appropriate and not

22  appropriate in getting declarations.  I -- we -- I can't reveal

23  my work product, but I went in detail through the case law in

24  this very court with my people as to -- to be careful, this,

25  that and the other thing.

1          But at any rate, the declarations are in evidence, I would

2     encourage the Court to look at the variation.  It is a classic

3     instance -- this case presents a classic instance where,

4     notwithstanding a very fine lawyer for plaintiff, it just boils

5     down to the same question addressed in Zackaria, and in so many

6     other cases, there is just no way to come to terms with each

7     individual's experience, particularly where so many have

8     testified that it's varied, and just incidentally, because this

9     is not summary judgment, vastly exempt positions, for years,

10    2004 and again in -- more recently, there is just not a way.

11         This is not some extraordinary and unusual case.  Not some

12    case different from the Burger King case, or any of the cases

13    that we present to the Court.  I, of course, encourage the

14    Court to look closely at all the cases that we cited because I

15    just think it's overwhelming.

16         And I did just want to touch upon --

17              THE COURT:  Why isn't it the Rite Aid case?

18              MR. KEMPLE:  It's not the Rite Aid case because there

19    is not the control -- by the way, I didn't see that plaintiff

20    actually cited the Rite Aid case.  I just went through all the

21    briefs on the break, and I didn't see any cite to the Rite Aid

22    case.

23              THE COURT:  Tierno versus Rite Aid.

24              MR. KEMPLE:  I'm sorry?

25              THE COURT:  We're talking about the same case?

1           MR. KEMPLE:  I don't know, which --

2           THE COURT:  Tierno versus Rite Aid.

3           MR. KEMPLE:  What was the first word, Your Honor?

4           THE COURT:  T-I-E-R-N-O.  Northern District of

5   California case in 2006.

6           MR. KEMPLE:  I don't think that's one that

7   plaintiff -- no.  At any rate, it's not -- I don't believe it's

8   one that's cited here.

9       The distinction here from those -- there are extraordinary

10  cases that have been certified.  They have been often roundly

11  criticized after they were certified, by the way, including the

12  cases that plaintiff cites to here.

13      The Avon case, for example, was cited by plaintiff.  Well,

14  that's fundamental -- we all basically know Avon.  These people

15  don't manage, they have independent contractors as their

16  workforce.  And the Court made the rather obvious point that,

17  wait a second, if your position is these folks are independent

18  contractors, you're obviously not controlling what they're

19  doing or you'd be in violation of that law.  It's an

20  extraordinary case where these types of cases have been

21  certified.

22      Counsel made reference to Dukes.  Dukes wasn't even a

23  misclassification case, let alone one that allowed

24  certification.  I'm just not sure what the point was being made

25  there.

1      But this case does not involve some common proof.  And

2   we've been wrestling with it for many briefs, many hours of

3   argument, no one has put their finger on something that would

4   allow the Court, in one stroke, to determine what each person

5   was doing in each of 11,000 weeks during this class period,

6   particularly where the testimony is so enormously varied.

7      This is a large company.  Like every company that turns out

8   a single product, hopefully uniform product, there are

9   procedures, restrictions, protocols for the creation of the

10  product.  That doesn't mean no management is required in the

11  company.

12     And, importantly, this is the sole manager in this

13  restaurant.  This is not a case where you have three or four

14  managers.  Some of the cases that are referenced here involve

15  assistant manager classes, where the manager is -- that's --

16  you're not going to get that one certified, but maybe you can

17  get some exempt supervisor position certified.  That's not this

18  case either.

19     Counsel has repeatedly returned to his experience in

20  Polasky [sic] versus Taco Bell.  You know, I don't know what

21  happened --

22          MR. JONES:  Puchalski.

23          MR. KEMPLE:  Puchalski.  Thank you.

24     I don't know what happened in Puchalski.  There has been no

25  evidence presented as to what happened in Puchalski.  There has

1    been no orders.  And this is a state court proceeding.

2        But what I do know is the one case that is cited in

3    Puchalski, the federal case said, in Puchalski, quote, It was,

4    quote, without contradiction that the majority of the manager

5    tasks were nonexempt.  That's the Akaosugi case that we cited,

6    it's in our brief, dealing with this Taco Bell decision.

7        This is federal court.  These are federal rules.  There is

8    a rich body of federal case law as to what the criteria are

9    here.  It doesn't -- I don't believe it makes it on

10   predominance.  I don't believe it makes it on the damages

11   analysis that is required.  And I understand damages alone, but

12   it's obviously a very heavy-weighing factor here.  And I think

13   there is just an enormous superiority issue, not only because

14   of the management issues but because these people are amply --

15   adequately incentivized to bring an individual action.  And,

16   indeed, they already have individual counsel.

17       So I'm obviously available to answer any questions the

18   Court -- oh, I did -- one last point, Your Honor.

19       The Court made reference to denial with, you know,

20   potentially another opportunity to bring a motion.  That's,

21   obviously, in the Court's discretion.  But I would counsel or

22   suggest the following, remind the Court of a few things.

23       This case has been going on for two years.  Plaintiff has

24   been talking about statistical evidence and surveys since

25   September 2014, after the answer was filed in this case.  And

1    we've presented that to the Court earlier.  He has had our

2    declarations for seven months.  He represents 59, at least --

3    at least -- he and his co-counsel represent at least 59 of

4    these class members.  As the Court pointed out, where the heck

5    are these declarations?  And I think the reason he doesn't want

6    to do it is because once you start putting forward

7    declarations, you're conceding how individualized these issues

8    really are; which they are.

9        There simply is no common proof here that overcomes the

10   predominance standards, let alone under a, quote, rigorous

11   analysis as required by the U.S. Supreme Court in determining

12   whether or not, in fact, the issues can be decided in one

13   stroke with one proof set.

14            THE COURT:  Do you know who the 59 are?

15            MR. KEMPLE:  I do not.  I know some of them.  I think

16   Mr. Jones, and we've attached this to our papers, gave us a

17   list, I believe, of 41 originally, and we know who they are.

18            THE COURT:  Are some of them individuals that have --

19            MR. KEMPLE:  Yes.

20            THE COURT:  -- that were part of the --

21            MR. KEMPLE:  Interestingly, yes.

22            THE COURT:  -- interviews?

23            MR. KEMPLE:  12 of the 27 were represented by

24   Mr. Jones.  But, interestingly, those 12 did not offer

25   declarations claiming that we did something improper with them.

1          THE COURT:  Was it Mr. Jones or Mr. Righetti?

2          MR. KEMPLE:  Yes.  Five did.

3          THE COURT:  "Yes" what?  Mr. Jones represented them

4    or Mr. Righetti?  Because Mr. Jones seems to suggest it's

5    really Mr. Righetti.

6          MR. KEMPLE:  I'm sorry.  Mr. Jones and Mr. Righetti

7    both represent Mr. Davenport in this action.

8          THE COURT:  I understand that.

9          MR. KEMPLE:  I've been told that Mr. Righetti

10   represents the 41.

11         THE COURT:  The other 41?

12         MR. KEMPLE:  Yes.

13         THE COURT:  Where is this Mr. Righetti?  How come I

14   never see him?

15         MR. JONES:  He's at his office in San Francisco right

16   now.  I was actually speaking to him during the break.  He

17   sends his regards.

18         THE COURT:  A lot of good it does me.

19         MR. KEMPLE:  I have met Mr. Righetti.

20         THE COURT:  Okay.

21         MR. KEMPLE:  So anyway, it's a quite extraordinary

22   circumstance where notwithstanding, you know, they have these

23   tentacles into the class, and indeed represent them on these

24   claims, we have not seen those declarations.  And, again, I

25   think it's because the declarations concede that, as it must,

1 | these are, in fact, individualized issues.

2 |         THE COURT:  It raises so many questions in my mind.

3 | What does "represent" mean?  No other lawsuits have been

4 | filed --

5 |         MR. KEMPLE:  I asked those questions.

6 |         THE COURT:  Well, again, but that gets into

7 | attorney-client privilege and work product.  I don't know, it's

8 | just interesting to me that you have access to these --

9 |         MR. KEMPLE:  And I was told --

10 |         THE COURT:  -- 59 other individuals and there is

11 | nothing from them.

12 |         MR. KEMPLE:  And I was told I could not speak with

13 | them, Your Honor.  I asked that very question, and I was told,

14 | No, you may not contact my clients.

15 |    So not only do they have them, I can't -- and I honored

16 | that, of course, I can't -- and I asked for that very

17 | clarification and was told, You may not speak with them, we

18 | represent them in this action.  And I, of course, honored that,

19 | Your Honor.

20 |    I'm at your disposal, Your Honor.  And thank you for your

21 | obvious consideration and detail.

22 |         THE COURT:  Mr. Jones, you may wrap up.

23 |         MR. JONES:  Thank you, Your Honor.

24 |    Just a few issues because I think we've hit most everything

25 | during our -- during the hearing today.  But you posed to me

1 various questions at the beginning of this hearing, and you

2 asked me to assume certain facts and assume certain things.

3 And so I've been answering Your Honor's questions under the

4 assumption of no bifurcation, for example, no random sampling

5 and no representative evidence.

6     As you know, the plan that I originally put forward to you

7 is a plan that has representative evidence.  You asked me

8 questions about how I came to the conclusion of the number.  I

9 told you.  One of the reasons why the plaintiffs believe that

10 this sort of a plan works, and has worked, is because if, in

11 fact, this variance exists, as Mr. Kemple suggests, and no two

12 people do the job the same way, then one would think that that

13 would flush itself out pretty quickly once you hear from ten

14 people, not that are selected by the plaintiff or by the

15 defendant but are selected randomly.

16         THE COURT:  I don't hear the defense arguing that no

17 two people do the job the same way.  It's more along the lines

18 of the cases where the evidence may more likely show that some

19 of the managers did mainly nonexempt work and some of the

20 managers did exempt work.  And you can't determine that in a --

21 in a class action.  You can't -- that, again, cuts against

22 certifying a class when the evidence is likely to show the

23 discrepancy.  It's not that the defense would have to show

24 that -- I mean, they'd want to show that all 108 were properly

25 classified, obviously.  But, again, it's this whole issue of

1    individualized proof versus proof that can be done through

2    common evidence.  We're right back to the start.

3                   MR. JONES:  We are.  We're right back to the

4    beginning, Your Honor.  And I'm not going to continue to repeat

5    myself.  It is a discretionary call on your part.

6         As I stated, and as we agreed, there are always some

7    individual issues, the question is whether or not common issues

8    predominate.  We believe that they do.  We've identified

9    several of them, one of which is proper task classification.

10   Of course you cannot tell, as Mr. Kemple is suggesting, whether

11   the job is exempt or, quote, managerial or not unless you

12   classify the tasks.  Since the tasks are the same, that is a

13   common issue that predominates.

14        And the second issue, which is different from the 50

15   percent test, is with respect to the independent judgment and

16   discretion.

17        I know that there's been a lot of talk today about rules,

18   and evidence with respect to Wendy's corporate policies, and I

19   would simply ask the Court to take a look back at

20   Mr. Sabharwal's deposition with respect to the independent

21   judgment and discretion issue.

22        And I will close, Your Honor, by saying that I've been

23   before you on two occasions now, on both of those occasions

24   you've indicated your desire to allow cases to be decided on

25   the merits.  That's all the plaintiffs are asking for in this

1   case, that they be allowed to have the case decided on the

2   merits in one courtroom, instead of having 108 separate cases

3   spread throughout the State of California, all of which will be

4   based upon the same evidence, the same witnesses and the same

5   documents.

6       I believe we have established that certification is

7   appropriate in this case, and I do thank you, Your Honor, for

8   the opportunity to present the arguments that we have presented

9   today.  It's not often that you're given a chance.  Most courts

10  with their dockets shut -- not shut you down, that's the wrong

11  word, but cut you off a little quicker.  So I do appreciate the

12  opportunity to answer the questions you posed here today.

13          THE COURT:  Okay.  I actually am prepared to resolve

14  the motion this afternoon.  The hearing was, obviously,

15  designed to answer questions that come up when courts examine

16  these types of motions.  And so I'm going to go through the

17  motion and issue a decision this afternoon.

18      Under the motion for class certification under Federal Rule

19  of Civil Procedure 23, the plaintiff, hoping to certify a

20  class, must demonstrate that the class is so numerous that

21  joinder of all members is impracticable, that there are

22  questions of law or fact common to the class, that the claims

23  or defenses of the representative parties are typical of the

24  claims or defenses of the class, and that the representative

25  parties will fairly and adequately protect the interests of the

1   class.

2        Plaintiff is also required to meet one of the requirements

3   listed under Federal Rule of Civil Procedure 23(b), and in this

4   case the plaintiff seeks to certify this class under 23(b)(3),

5   which does require that the plaintiff show that the questions

6   of law or fact common to class members predominate over any

7   questions affecting only individual members, and that a class

8   action is superior to other available methods for fairly and

9   efficiently adjudicating the controversy.

10        Certification is proper only if the trial court is

11   satisfied after a rigorous analysis that the prerequisites of

12   23(a) have been satisfied.  That is the Wal-Mart Stores versus

13   Dukes case.

14        The ability of the proposed class to satisfy Rule 23 is the

15   primary focus of a class certification analysis, but that

16   analysis may overlap with the legal and factual issues

17   underlying the plaintiff's claims.

18        Generally, the court should not consider whether the party

19   seeking class certification is likely to prevail on the merits;

20   nevertheless, the court is not only at liberty to consider

21   evidence which goes to the requirements of Rule 23, but in fact

22   is required to consider such evidence, even if the evidence may

23   also relate to the underlying merits of the case.

24        If the court concludes that the moving party has met its

25   burden of proof, the court then has broad discretion to certify

1    the class.

2        In terms of the numerosity requirement, there is no

3    dispute, defendants don't dispute, there are 108 potential

4    class members.  It is not at issue and that requirement has

5    been satisfied.

6        As to typicality, as I've indicated, that also, the Court

7    finds, has been satisfied in this case.  That rule requires

8    that the claims or defenses of the class representative be

9    typical of the claims or defenses of the class.  In this case

10   Mr. Davenport does fit that description and that requirement is

11   met.

12       Defendants have challenged that, arguing that his --

13   Mr. Davenport's employment experience is atypical.  Plaintiff

14   has argued that Mr. Davenport's claims are typical of the class

15   he seeks to represent because, like the rest of the putative

16   class members, he was not paid any overtime hours, he worked in

17   excess of 8 hours per day, or 40 hours per week, he received

18   noncompliant wage statements, he was forced to work through his

19   meals, and he was subject to the same level of control by

20   Wendy's as the other putative class members.  The Court does

21   find that that does satisfy the typicality requirement, and

22   therefore that is not at issue in this case as far as the Court

23   is concerned.

24       In terms of adequacy, 23(a)(4) has two requirements:  That

25   the named plaintiff and their counsel do not have conflicts of

1    interest with the proposed class, and that the named plaintiffs

2    and counsel can prosecute the action vigorously on behalf of

3    the class.

4        Again, I don't find this to be a significant issue with

5    respect to this motion.  Defendant has again challenged this,

6    arguing that the plaintiff and plaintiff's counsel may have

7    potential conflicts of interest with members of the proposed

8    class because one of the plaintiff's lawyers also represents

9    other potential members of the class, a list that is apparently

10   up to now 59 potential class members.

11       Potential conflicts of interest are, indeed, enough to

12   render class counsel inadequate, but each of the cases that

13   defendant has cited to support its argument with respect to

14   this requirement that Mr. Righetti's representation of

15   potential class members creates a conflict between plaintiff's

16   counsel and potential members are not applicable in this

17   situation.

18       In the case, case counsel was required to withdraw from

19   representing other potential class members because there were

20   already pending lawsuits.  In Ortiz versus Fiberboard, the

21   court held that in an asbestos case counsel could not represent

22   both individuals with present claims and individuals who might

23   have claims in the future.  Those who had not yet sustained an

24   injury, in Sandoval versus Ali, the court declined to find

25   counsel inadequate because defendant failed to prove that

1   superior court plaintiffs and federal court plaintiffs would

2   have to argue inconsistent positions.

3        There is not at least persuasive case law presented by

4   defendants that counsel are, in this case, presumptively

5   inadequate or there is an actual conflict that would prevent

6   Mr. Jones or Mr. Righetti from litigating this case.

7        In terms of Mr. Davenport himself, he has been actively

8   involved in the litigation of this case, and he has declared

9   under penalty of perjury that he will fairly and adequately

10  protect the rights of other class members.

11       And then in terms of the experience of Mr. Jones and

12  Mr. Righetti, there is no question that they are experienced,

13  and without question could adequately represent the interests

14  of the class should it be certified.

15       So, again, the Court finds that the plaintiff has met the

16  adequacy requirement.

17       The next issue is commonality, which goes hand in hand in

18  many ways with the final issue, the guts of this case, the

19  central issue, as to whether there are common questions that

20  predominate in this case.

21       In terms of just commonality itself, plaintiffs have

22  satisfied this element by showing that, at a minimum, the

23  existence of shared legal issues with divergent factual

24  predicates, or common core of salient facts coupled with

25  disparate legal remedies, then the class could still satisfy

1    the showing required.

2        In Dukes, the Supreme Court clarified what this role

3    requires in stating that, What matters to class certification

4    is not the raising of common questions, even in droves, but

5    rather the capacity of a class-wide proceeding to generate

6    common answers apt to drive the resolution of the litigation.

7    Even a single common question that meets these criteria could

8    satisfy Rule 23(a)(2).

9        Rule 23(b)(3) adds another commonality condition, and we'll

10   talk about that, and that is the condition that questions of

11   law or fact common to class members must predominate over any

12   questions affecting only individual members.  And Rule 23(b)

13   also adds a superiority requirement, which the Court will also

14   discuss in a second.

15       The merits issue at the heart of this case is whether

16   plaintiff and other Wendy's general managers, GMs, are exempt

17   from overtime requirements imposed by California law.

18       The court, facing the same issue regarding certain Wal-Mart

19   employees, characterized the issue as follows:

20       In evaluating commonality and predominance under the

21   exemptions at issue, the court must ask whether the work

22   experiences of the putative class members are so similar that

23   determining whether the exemption conditions have been met on a

24   class-wide basis would further the goals of efficiency and

25   judicial economy, or whether those experiences are so distinct

1  that determining whether the exemptions apply would require an

2  individualized inquiry into the manner in which each employee

3  actually carried out his or her work.  That's the Zackaria

4  versus Wal-Mart case that we've been talking about today.

5      In Zackaria, the court broke the commonality inquiry into

6  two issues:  First, do common questions exist.  And, second, do

7  the common questions predominate.

8      In terms of the existence of common questions, I do find

9  that there are common questions in this case.  In fact, I don't

10  think that can be disputed.  The evidence does show that there

11  are certain issues in this case that are subject to common

12  evidence, common proof, including, in particular, documentary

13  evidence that has been submitted by plaintiff in support of its

14  motion.

15      I've also indicated that I think this case is very similar

16  to Zackaria.  In Zackaria, the plaintiff sought to certify a

17  class of individuals employed by Wal-Mart.  Like the plaintiffs

18  in this case, the plaintiff in Zackaria argued that Wal-Mart

19  misclassified him and other classified members as exempt

20  employees under state law, and paid them on a salary basis

21  without any compensation for overtime hours worked, missed meal

22  periods or rest breaks.  Wal-Mart in that case argued that the

23  employees were subject to the administrative and executive

24  exemptions, and therefore not entitled to overtime or pay for

25  missed breaks.

1        In Zackaria, the court actually did find, and the Court so

2   finds here, that the plaintiff did satisfy the commonality

3   requirement because, quote, Although some members of the

4   putative class have had divergent work experiences, plaintiffs

5   are all identically classified employees of the same company,

6   sharing the same job title and assigned roughly similar job

7   responsibilities, and they all raise identical legal questions,

8   that is, whether they were misclassified as exempt and, if so,

9   whether they were denied overtime pay and meal and rest breaks

10  to which they are entitled under state law.

11       Defendant in this case before the Court today has argued

12  that plaintiff has failed to establish commonality; however,

13  the defendant describes in its opposition to plaintiff's motion

14  to certify the duties that are common to all Wendy's GMs.

15  These duties include:  Analyzing supply costs, coaching and

16  training crew members and shift leaders, meeting sales and

17  profit goals and much more.

18       Defendant has included a section in its opposition to the

19  motion to certify entitled, Plaintiff Fails To Provide Evidence

20  of Predominance/Commonality.  In this section, however,

21  defendant largely focuses on arguing that the general managers

22  spend most of their time on nonexempt activities.

23       This issue goes to whether plaintiff and putative class

24  members were, indeed, exempt from California law's requirement

25  payment of overtime.

1          Defendants' emphasis on the merits of the issue does not,

2     in effect, defeat plaintiff's arguments with respect to the

3     issue that there are certain common questions of fact.

4          Again, it's separate from whether -- and we'll get to it --

5     whether those common questions of fact predominate.

6          Defendants' argument that all GMs spent the majority of

7     their time on nonexempt duties suggests that there are common

8     issues of law and fact that pertain to all GMs.  Defendants'

9     argument that all GMs are exempt from overtime goes to the

10    merits of the litigation.  It may be premature, and the Court

11    is not deciding that at this point, but I do find that there

12    are at least sufficient common questions of law in this case

13    between plaintiff and the putative class members, and that

14    would satisfy that commonality issue, just as in the Zackaria

15    case.

16         But then we come down to the critical issue, and that is

17    the 23(b)(3) issue as to whether these common issues

18    predominate.

19         The courts have made clear that the test for predominance

20    is more demanding than the commonality test.  If the main

21    issues in a case require the separate adjudication of each

22    class member's individual claim or defense, then a

23    Rule 23(b)(3) action would be inappropriate.  That's the Zinser

24    case, a Ninth Circuit case cited in the briefs.

25         And in this case, as in other cases facing these types of

1   motions, while the Court may need to and has looked somewhat to

2   the merits of the case to determine if common proof can be used

3   in the case, the Court has only looked into the merits in order

4   to determine whether common questions exist.

5       In Zackaria, the court did deny class certification because

6   the court found that depositions from several employees showed

7   that the employees' work experiences were not completely

8   uniform, and therefore whether they were primarily engaged in

9   exempt duties could not be answered with common proof.

10      The court also held, however, that this does not mean that

11  common questions cannot predominate in misclassification cases.

12  Indeed, in a case in which the employee work activities are

13  more uniform, an examination of how employees actually spent

14  their time could be accomplished using common proof.

15      In Zackaria, similar to this case, the court specifically

16  addressed in these exemption cases the requirements in an

17  exemption case as to whether the employees at issue customarily

18  and regularly exercise discretion and independent judgment, and

19  whether they are primarily engaged in the performance of exempt

20  duties.

21      In Zackaria, the plaintiff in that case put forth many

22  declarations in which the plaintiffs and putative class members

23  in that case said that they could not, they do not, and they

24  were not exercising any discretion in the performance of their

25  regular duties, that they played no role in preparing policy,

1    they did not have any influence over what went into policy.

2    There was a deposition that there was no discretion to simply

3    not follow policy.  There is a deposition that the putative

4    class member testified that she did not deviate from policy and

5    procedures because it was her job to follow policy and

6    procedures.  And as in this case, the defendant in Zackaria

7    presented evidence that differed from that of the plaintiff in

8    two primary ways:

9        First, some of the evidence introduced by the defendant in

10   that case indicated that even if the plaintiff and/or the

11   putative class members did not deviate from the policies,

12   carrying out the tasks enumerated in the policies involved

13   independent judgment and discretion.

14       And, second, there was other evidence suggested that the

15   putative class members did, in fact, deviate from the policies

16   and guidelines and had the discretion to implement their own

17   safety and security policies in their particular stores.

18       And, again, the case cites numerous depositions that were

19   submitted.

20       The court went on to hold that there are many examples in

21   the record, all of which illustrate that whether an individual

22   putative class member exercises judgment and discretion cannot

23   be determined merely by reference to uniform policies or

24   procedures because the daily work activities are not uniform,

25   the questions that need to be asked to determine whether

1    plaintiffs meet this factor are individualized.

2        This was the case that also found -- or the court held

3    that, In undertaking a commonality and predominance inquiry in

4    misclassification cases, the court considers a rough hierarchy

5    of certain types of evidence.  At the bottom are company

6    policies declaring that a certain job title is uniformly exempt

7    or nonexempt.  More useful to the court are comprehensive

8    uniform policies detailing the job duties and responsibilities

9    of the employees.

10       In this case there is evidence submitted by the plaintiffs

11   of such comprehensive uniform policies.  And as the court in

12   Zackaria held, these carry more weight because centralized

13   rules, to the extent they reflect the realities of the

14   workplace, suggest a uniformity among employees that is

15   susceptible to common proof.

16       And then the court goes on to write, Equally important is

17   evidence that bears on whether class members are actually

18   performing similar duties.

19       And it's that factor that I focused on in my questions to

20   both of you, and that is of greatest concern to the Court in

21   this case.  I don't believe that the plaintiff has met its

22   burden in support of this motion with respect to that factor,

23   whether class members were actually performing similar duties.

24   There is, again, evidence of policies, procedures, but little

25   evidence, or insufficient evidence, in terms of what actually

1   was going on.

2       And I have to -- although not giving as much weight to the

3   declarations as the defendant has asked, I cannot ignore the

4   fact that there are, in fact, numerous other putative class

5   members that absolutely dispute the plaintiff's characteristic,

6   and the other two primary declarations that were submitted --

7   dispute as to what was actually going on in these stores and

8   the work that was being performed by the general managers.

9       There is an interesting case -- hang on, I want to make

10  sure I have it -- it was in Duran.  It was an interesting

11  quote, this is Duran versus Robinsons-May, Inc., it's a 2003

12  state court case, court of appeals.  That interesting language

13  that made me think about this case as well, that case involved

14  far more employees, 1600 employees, there were significant

15  amounts of declarations and depositions submitted in that case.

16  And in that case, the court found as follows:

17      Defendants' evidence, especially that given by more than 60

18  ASMs -- they call them GMs in this case -- offer strong support

19  for the position that ASMs work differently and spend 50

20  percent or more of their time on exempt activity.  Although

21  much of the evidence represents subjective opinions, these ASMs

22  clearly regard their work as executive and discretionary in

23  nature.  They do not feel constrained by company dictates.

24  They believe they operate within their own realms under their

25  own rules.  Meanwhile, plaintiffs' ASM declarants have the

1  opposite view, seeing themselves as suffering under the

2  oppressive company thumb, slaving mostly on nonexempt tasks.

3  But the conflict in the evidence could reasonably be resolved

4  by the trial court in favor of the defendant.  And if a similar

5  split in opinion exists company-wide among ASMs, it would not

6  be proper to certify plaintiffs as class representatives for a

7  class whose members are so dissimilar in their interests.

8  Common questions of fact could not predominate among the 1600

9  ASMs.

10      And I think that's telling and instructive in this case,

11  that the evidence suggesting a split again operates against

12  granting the motion to certify this class.

13      Plaintiff has argued there are three main issues in this

14  case which would require common proof:

15      First, that whether Wendy's practice of uniform --

16  uniformly classifying all GMs as exempt violates California

17  law;

18      Second, whether the GMs spent more than 50 percent of their

19  time performing exempt work;

20      And three, and we had a lot of discussion about this,

21  whether the GMs regularly and customarily exercised discretion

22  and independent judgment.

23      Plaintiff has argued that these issues can be decided on a

24  class-wide basis by looking at, among other things, Wendy's

25  standardized job descriptions and training policies.  Plaintiff

1   has suggested that the Court could hear evidence from ten

2   random general managers to testify after the Court has

3   classified certain tasks as exempt or nonexempt, and defendant

4   has argued against each of these proposed methods of common

5   proof.

6        Defendant has argued that the documents of job descriptions

7   and training policies are insufficient common proof to show

8   that all GMs were improperly classified as exempt.

9        Uniform corporate policies evidenced by documents will

10  often bear heavily on questions of predominance and

11  superiority, but documents of policies and procedures alone are

12  not sufficient common proof regarding whether employees are

13  exempt or not.  That's the Marlo case, which we have talked

14  about also at length, and which supports the defendants'

15  arguments in this case.

16       Since documentation does not prove that employees were

17  actually engaged in such activities, plaintiffs in

18  misclassification class actions must be able to show what work

19  the employees actually performed during the workweek, under

20  California Code of Regs, Title 8, Section 11090.

21       The Court can look to Wendy's policies and procedures to

22  try to determine if commonality and predominance exists, but

23  the Court must also consider the actual practices of the GMs on

24  a day-to-day or week-to-week basis.

25       Defendants have objected to plaintiff's second proposal for

1    common proof.  I have not given much weight to that argument.

2    As I've indicated, the proposal would not work in this court.

3    And plaintiff has offered little or no proof that that

4    experience in the other case would in fact be representative of

5    the experience of the 108 GMs that are potential class members

6    in this case.

7        Defendant has also argued that there is so much variation

8    in what the GMs do that the issue of exemption for each GM

9    cannot be decided in one case.

10       Defendant has cited to the declarations obtained from the

11   GMs, both in 2004 and 2014, and has argued that these

12   declarations show great variation among GMs regarding the time

13   spent on exempt and nonexempt work.  Again, I found those to be

14   some evidence.  I have not given them as much weight as the

15   defendants have requested or believe that they should be given,

16   but they are some evidence that there are divergent experiences

17   among these 108 class -- potential class members that would

18   include class treatment of the claims in this case.

19       The job descriptions, evaluation forms, operation standards

20   manual and daily operation plans that plaintiff has included in

21   its motion for class certification do show, in fact, that

22   Wendy's does have and did have a highly standardized -- that

23   Wendy's is highly standardized in terms of how each of these

24   stores are run.  But these documents alone, the Court finds,

25   are insufficient to meet the burden of proof with respect to

1   the predominance of common issues.

2       As I indicated, plaintiff also relies heavily on three

3   declarations and a deposition of the person most knowledgeable

4   from the defendant in support of its motion for class

5   certification.

6       In each of these declarations, the focus is primarily on

7   the policies and procedures of Wendy's as opposed to, again,

8   the work actually performed.  And, similarly, the deposition of

9   Rajeev Sabharwal, S-A-B-H-A-R-W-A-L, focuses primarily on

10  policies and procedures.

11      Plaintiff has attempted to provide some evidence of whether

12  the tasks that the GMs actually performed were, in fact,

13  uniform.  The declarations of Mr. El-Azazy, A-Z-A-Z-Y, and

14  Mr. Mena, who both worked as district managers and supervised

15  general managers, included statements that, as district

16  managers, they had to travel to several stores to make sure

17  that each general manager was following Wendy's policies and

18  procedures.  They've also stated that if a general manager was

19  deviating from policy, that they would tell the general manager

20  to comply with policy, and failure to do so could lead to

21  termination.

22      This evidence does suggest that general managers indeed

23  followed the uniform policies while they were working, but it

24  still does not provide direct evidence of whether the potential

25  class members actually followed all the uniform procedures on a

1    day-to-day basis.

2        Each declarant also testified that general managers

3    regularly worked more than 50 hours a week.  However, this

4    evidence actually shows the difference between individual

5    general managers.  As the defendants' counsel pointed out,

6    these declarants provide ranges of 50 hours a week, 55 hours a

7    week and 80 hours a week.  The differences among even these

8    three putative class members and these declarations again show

9    that there were differences between individual general

10   managers.  There were no declarations that were provided by

11   plaintiff from any other potential class members regarding the

12   actual tasks or work that was performed on a daily basis.

13       And, in contrast, the defendant has provided with its

14   opposition to this motion 27 declarations of tasks that general

15   managers actually performed.  And these 27 declarations, while

16   nearly identical to each other, do show, at least, that there

17   would be evidence in this case that Wendy's business model,

18   while standardized, involves actual differences as to how those

19   job duties are performed by the general managers.

20       The declarations and evidence submitted by the defendant

21   show that there are differences between how GMs perform their

22   jobs, that revenues, number of employees and turnover rates

23   vary greatly among Wendy's restaurants.  Declarations show that

24   each general manager's job responsibilities, while very

25   similar, involved different amounts of time spent on various

1  tasks, and that varies greatly on the individual general

2  manager and the store that he or she is working at.

3      Examples of some of those declarations include the Rivera

4  declaration, the Deanda declaration and the Sanchez

5  declaration.

6      What these declarations at least suggest is that there

7  are -- while there are many, many similarities in how the GMs

8  perform their jobs, and that there are expectations, the

9  declarations also clearly show that in looking at the actual

10  performance of these -- of these jobs and these positions, the

11  evidence is likely to show significant differences, and

12  therefore would require individual proof.

13      Plaintiff has argued that the declarations are suspect and

14  that they do not reflect the actual duties performed by GMs on

15  the job.  Plaintiff, in response, submitted eight declarations

16  -- eight new declarations explaining what duties individual

17  general managers performed.

18      The eight declarations, which were attached to the motion

19  to strike, do address, in very general terms, the experience

20  that the declarants had when defense counsel interviewed them.

21  Some of these declarants stated that their original

22  declarations didn't accurately reflect the duties they

23  performed.  But the problem with the eight declarations that

24  were submitted, again, they don't go into detail and they

25  aren't very specific as to what actual duties each of these

1  individuals were performing, they really focused on what the

2  lawyers did or didn't tell them in the earlier information

3  gathering and interview gathering sessions conducted by

4  plaintiffs -- or defendants' lawyers.

5       The burden is on the plaintiff to show predominance, and

6  the Court finds that plaintiff has failed to produce sufficient

7  evidence of predominance beyond the uniform policies and

8  procedures to demonstrate that common issues predominate over

9  individual issues.

10      Again, the record should be clear, the Court is relying

11  heavily on the Ninth Circuit decision -- I'm sorry, the Central

12  District of California's opinion in Zackaria versus Wal-Mart in

13  reaching its conclusions that common issues do not predominate

14  in this case.

15      My findings are very similar to what is summarized at the

16  end of Zackaria, and I want to read that as well.  In Zackaria,

17  the court held as follows:

18      In sum, the record is clear that all APCs receive very

19  similar training and that the overall job expectations are

20  roughly identical no matter what California store the APC is

21  being hired into.  These showings, in addition to the fact that

22  defendant classifies all APCs as uniformly exempt, suggests a

23  uniform set of expectations for APCs on the part of defendant

24  and a level of commonality across the putative class.  But the

25  touchstone of an exemption analysis is the reality of the

1  workplace and the way in which employees actually spend their

2  time, and the record before the court suggests that determining

3  whether an APC is primarily engaged in activities meeting the

4  test for an exemption is an individual question, not one that

5  can be easily resolved through common proof.

6      This does not mean that common questions cannot predominate

7  in misclassification cases.  Indeed, in a case in which

8  employee work activities are more uniform than they are among

9  California APCs, an examination of how employees actually spend

10  their time could be accomplished using common proof.  The

11  existence of certain individualized or deviating facts will not

12  preclude certification if most class members were subjected to

13  a company policy in a way that gives rise to consistent

14  liability or lack thereof.

15      The court has merely found that here -- speaking in the

16  Zackaria case -- common proof would likely be insufficient to

17  establish the presence or absence of nearly all of the

18  exemption conditions.

19      Because the merits of this case cannot be resolved without

20  significant individual inquiry, the court finds that common

21  questions do not predominate.

22      And in this case, the Court reaches the same conclusion.

23      And then, finally, in terms of superiority, that requires

24  that the plaintiff seeking to certify a class must also show

25  that class resolution is superior to other available methods

1   for the fair and efficient adjudication of the controversy.

2   Specifically, a plaintiff must show that a class action is

3   superior to other methods of adjudication considering the

4   likely difficulties in managing a class action.

5       The manageability requirement includes consideration of the

6   potential difficulties in notifying class members of the suit,

7   calculation of individual damages and distribution of damages.

8       Defendant has argued that a class action would not be

9   superior here because of, among other things, the fact that

10  potential class members do have an incentive to litigate these

11  issues even if the class is not certified.  And defendant has

12  also argued that a class action is not superior to individual

13  litigation because plaintiff has failed to show a common way

14  for calculating damages.

15      Plaintiff has argued that differences in damages alone do

16  not preclude class certification.  And plaintiff has also

17  suggested that the Court should bifurcate the trial so as to

18  render defendants' argument that individual damage

19  determinations defeat -- that would defeat class certification

20  is, in fact, moot.

21      The amount of damages does not necessarily dictate whether

22  a class action is superior to individual litigation.  And

23  that's the Boyd versus Bank of America case.

24      So applying that, the amount of damages in the calculation

25  of damages does not, in and of itself, preclude class

1  certification.  Calculation of damages, however, as opposed to

2  the amount of damages, is something that a court should

3  consider in determining superiority.

4      In this case, all the general managers worked different

5  amounts of overtime for a different amount of weeks.

6  Additionally, some general managers worked during the entire

7  relevant period, while others only worked for less than 50

8  weeks during the class period.  That causes great concern to

9  the Court in terms of a damage phase, even if it was

10  bifurcated.  And it seems impossible to calculate damages on a

11  class-wide basis in this case.

12      While plaintiff may be able to show and provide a method

13  for calculating damages, it is clear that it would still

14  require -- even if, for example, forms are used, a special

15  master is used, it still would require individual examination

16  by the defense as to whether the information provided by

17  putative class members or class members was accurate, and that

18  would entail, again, individualized proof as opposed to proof

19  by way of simply the class action route.

20      Again, while plaintiff may succeed in showing that his

21  litigation plan on the damages issue is manageable, the Court

22  finds that the plaintiff has failed to prove that the class

23  action route -- that certification of the class would be

24  superior to individual litigation in this case.

25      For those reasons, the Court -- for all those reasons, the

1    Court denies plaintiff's motion to strike and denies

2    plaintiff's motion for class certification.

3        Okay.  Defendant may prepare a written order, if you'd

4    like, that accurately reflects the Court's ruling.  In most of

5    these cases I simply suggest that you order the transcript and

6    attach an order that says, For the reasons stated in the

7    transcript of the hearing, the Court has denied the motion.

8        So we will not proceed by way of a class action, and if

9    Mr. Davenport wants to continue to proceed as an individual,

10   then we will proceed in that manner.

11       Okay.  Thank you.

12           MR. KEMPLE:  Thank you, Your Honor.

13           MR. JONES:  Thank you, Judge.

14               (Proceedings adjourned, 4:01 p.m.)

15                   ---oOo---

16   I certify that the foregoing is a correct transcript from the

17   record of proceedings in the above-entitled matter.

18

19                   /s/ Kimberly M. Bennett
                     KIMBERLY M. BENNETT
20                   CSR No. 8953, RPR, CRR, RMR

21

22

23

24

25